Waldemar P. SHERWIN, Plaintiff, Appellant,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.**

No. 81–1885.

United States Court of Appeals, First Circuit.

Argued May 6, 1982.

Decided June 22, 1982.

Rehearing Denied July 19, 1982.

Richard K. Latimer, with whom Kistin, Babitsky, Latimer, Oppenheim, Kalnins & Beitman, Falmouth, Mass., was on brief, for plaintiff, appellant.

Robert J. Triba, Asst. Regional Atty., Dept. of Health and Human Services, with whom William F. Weld, U. S. Atty., and Ralph A. Child, Asst. U. S. Atty., Boston, Mass., were on brief, for defendant, appellee.

Before PHILLIPS,* Senior Circuit Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

The appellant, Waldemar Sherwin, is a 46 year old man with a ninth grade education. In February 1979, when he was 44, Sherwin applied for Social Security disability benefits because of arthritic joint pain and "pericarditis." After a hearing, an Administrative Law Judge denied the claim on the ground that Sherwin was not "disabled" within the meaning of the relevant statute, 42 U.S.C. § 423(d). Sherwin exhausted all internal appeals with the Social Security Administration (SSA). The district court upheld the SSA's denial of benefits. Sherwin appealed, attacking the validity of the "Grid" used by the SSA in evaluating his case. We reject this attack and affirm the SSA's denial.

To help understand this case, we begin by repeating the basic legal structure for evaluating a disability claim, see Vazquez v. Secretary of Health, Education and Welfare, 683 F.2d 1 (1st Cir. 1982). The ultimate question is whether Sherwin is disabled within the meaning of 42 U.S.C. § 423(d). That provision defines "disability" as

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... [lasting at least a year and] of such severity that [the claimant] ... is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him or whether he would be hired if he applied for such work.

It is well established that, in applying this statutory standard, the claimant has the burden of showing a disability serious enough to prevent him from working at his former jobs, at which point the burden

shifts to the Secretary to show the existence of other jobs in the national economy that the claimant can nonetheless perform. Torres v. Secretary of Health and Human Services, 677 F.2d 167, 168 (1st Cir. 1982); Pelletier v. Secretary of Health, Education and Welfare, 525 F.2d 158 (1st Cir. 1976). To simplify the task of proving the existence of a disability in these cases, the Secretary has promulgated a set of Medical-Vocational Guidelines ("the Grid"). 20 C.F.R. Part 404, Subpart P, Appendix 2 (1981) (hereinafter referred to as "Grid, § _____"). The Grid is designed to help the Secretary, when appropriate, satisfy his burden of proving the existence of other jobs in the economy that the claimant can perform. Sherwin showed that he could not perform his prior job as a forklift operator; thus the Grid came into play.

The Grid is basically a matrix, combining different permutations of the four essential factors set out in the statute (age, education, work experience, and residual work capacity) and stating, as to each combination, whether a claimant with those characteristics is "disabled" or "not disabled." It consists of three separate tables, one for those who retain the residual exertional capacity to perform "sedentary" work, one for those who retain the residual capacity to perform "light" work, and one for those who retain the residual capacity to perform "medium" work. Each table has five columns for rule number, age, education, work experience, and decision. Thus, each row on the table presents a different combination of age, education, and work experience categories. The ALJ simply selects the proper table and row based on the characteristics he finds the claimant to possess, and reads the decision, "disabled" or "not disabled" from the right-hand column in that row. See Appendix.

The Secretary's instructions for the use of the Grid are explicit. The ALJ is to determine the claimant's relevant characteristics. Each of these "findings of fact is subject to rebuttal and the individual may

* Of the Sixth Circuit, sitting by designation.

present evidence to refute such findings." *Grid*, § 200.00(a). Once found, the claimant's characteristics will either fit squarely within one of the rules in the table or they will not. If they do—if the "findings of fact ... coincide with all of the criteria of a particular rule"—then "the rule directs a conclusion as to whether the individual is or is not disabled." *Id.* If the facts do not fit squarely within a rule because they reveal a borderline case or a case lying between two rules, those rules still "provide guidance;" they are to be given "consideration," and they "provide an overall structure for evaluation." *Id.* § 200.00(d). If instead, the facts do not fit squarely within a rule because the claimant has a combination of impairments—particularly if the claimant has a nonexertional impairment—the guidelines suggest still more individualized consideration. *Id.* § 200.00(e).

■ In this case, Sherwin initially argues against the way in which the Grid was applied to him. He claims the ALJ erred in finding that he had a residual capacity to perform "sedentary" work. 20 C.F.R. § 404.1567(a) (1981). He says that constant pain in his hands or the drugs he had to take for pain relief rendered him completely disabled. We have reviewed the record, however, and find that we must reject this claim. The issue of pain was adequately explored by the ALJ; in light of the subjective nature of pain, we pay particular attention to his evaluation, *see Gaultney v. Weinberger*, 505 F.2d 943, 946 (5th Cir. 1974); and we have found more than enough evidence to support the ALJ's conclusion. Sherwin's own testimony, for example, indicates that he can use his hands for a wide variety of tasks (*e.g.*, cooking, washing dishes, driving his car, shaving, buttoning his shirt), and that medication relieves his pain. His own doctor wrote that Sherwin was "disabled for his usual and customary type of work" as a forklift operator, but did not in any way indicate that Sherwin could not perform "sedentary" work. Another doctor noted that

Sherwin could make a complete fist with his right hand, a partial fist with his left hand, that his grasp was "moderate and equal," and that he could "approximate his thumb to his finger slowly, but without any difficulty." Finally, while noting that Sherwin probably had some form of arthritis, "swelling sometimes in his hands," and "a little limitation of motion," the state's medical advisor testified that these conditions could go into remission, could be "treated" and "controlled for long periods of time," and did not then appear to be active in Sherwin's case.

■ Sherwin also argues that the side effects of the drugs that he used disabled him. He claims the ALJ should have explored this matter further. In fact, the ALJ asked Sherwin what the drugs did for him. Sherwin answered that they relieved the pain. He said nothing about side effects. Although the ALJ did not specifically refer to side effects, it is reasonable for the ALJ to assume Sherwin would have mentioned them had they been significant. Indeed, Sherwin did mention that he was taken off one drug because it bothered his stomach. Thus, the ALJ's determination that Sherwin possessed a "sedentary" residual work capacity is adequately supported. Consequently, the Grid directs a finding of "not disabled," *Grid*, Rule 201.24; it would do so even were Sherwin older or less well educated. *See Grid*, Rules 201.18, 201.23.

Sherwin's principal argument on appeal amounts to an attack on the Grid itself. We have previously upheld the Grid as a legitimate exercise of the general rulemaking authority granted to the SSA by 42 U.S.C. § 405(a). *See Torres v. Secretary of Health and Human Services, supra. See also Santise v. Schweiker*, 676 F.2d 925 (3d Cir. 1982); *Cummins v. Schweiker*, 670 F.2d 81 (7th Cir. 1982); *Salinas v. Schweiker*, 662 F.2d 345 (5th Cir. 1981) (Grid upheld as a valid exercise of administrative notice); *Frady v. Harris*, 646 F.2d 143 (4th Cir. 1981). *But cf. Campbell v. Secretary of Health and Human Services*, 665 F.2d 48,

53–54 (2d Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 2956, 73 L.Ed.2d 1348, (1982); *Hall v. Harris,* 658 F.2d 260, 268 (4th Cir. 1981). The Grid represents an attempt to replace the live testimony of vocational experts, to "streamline" adjudication, and to achieve greater uniformity in the tens of thousands of disability cases heard each year. *Cummins v. Schweiker,* 670 F.2d at 83. This objective is reasonable given the fact that "[i]n fiscal 1976, for example, the agency's ALJs disposed of 180,000 cases; by contrast, during that same time period, only 130,000 civil and criminal matters were terminated by the entire Article III court system. Approximately 8,000 appeals were brought in 1978 from agency disability-related determinations to the federal district courts; this litigation 'constitute[d] the largest portion of the workload of the federal judiciary from federal agencies.'" *Santise v. Schweiker, supra,* 676 F.2d at 930, *quoting Dobrowolsky v. Califano,* 606 F.2d 403, 409 n.18 (3d Cir. 1979). *See also* K. Davis, 3 Administrative Law Treatise § 15.18 at 199 (1980). Moreover, since the issue at stake—the existence, of jobs anywhere in the national economy—involves "legislative," not "adjudicative" facts, it seems well suited to agency rulemaking. K. Davis, 3 Administrative Law Treatise § 15.2 (1980). Promulgated after research, notice and comments, 43 Fed.Reg. 9284, 55349, the rules may prove not only a more efficient way to resolve the "other jobs" issue, but also (insofar as the knowledge of individual vocational experts is not complete) a more accurate one. At the same time, the SSA seeks to maintain the fairness and accuracy of its determinations by providing the claimant with a full opportunity to adjudicate the facts related to age, education, prior work experience, and residual work capacity. Further, the Grid will offer only guidance—it will not determine "disability"—in borderline cases or where nonexertional, or additional, disabilities are at issue.

Sherwin attacks the Grid in several ways. First, he claims that in directing conclusions of "disabled" or "not disabled," the Grid in effect takes conclusive, irrebuttable "administrative notice" of facts (the existence of other jobs for someone with a given age, education, work experience and "residual functional capacity"). He points out that 5 U.S.C. § 556(e) states that when an agency takes "administrative notice" of a fact, the opposing party shall have "an opportunity to show the contrary." Sherwin says that he was given no such opportunity here, and therefore the Agency's use of the Grid is unlawful.

■ We disagree. The Agency stated at the time the Grid was adopted that it was *based upon* "administrative notice" of conditions in the national labor market. That does not make the Grid an *instance of* "administrative notice." Rather, the Grid is a set of *rules,* promulgated pursuant to informal "notice and comment" rulemaking procedures, 5 U.S.C. § 553. The terms of 5 U.S.C. § 556(e) do not literally apply to informal rulemaking, *see* 5 U.S.C. § 556(c), and thus do not automatically require a disability claimant to be given the chance at his adjudicatory claims hearing to contest the "facts" underlying the Grid. *Cf. Torres v. Secretary of Health and Human Services, supra* (where the Grid directs a finding of "not disabled," ALJ need not list specific jobs the claimant can perform). *But cf. Campbell v. Secretary of Health and Human Services, supra.*

■ Nonetheless, informal rules can still be attacked as unlawful. Sherwin has been given the opportunity here to make two such substantive attacks on the Grid's factual basis—attacks that amount to the claim that the Grid or at least the Agency's failure to modify it, is "arbitrary." 5 U.S.C. § 706(2)(a). From a procedural point of view, Sherwin's attacks are in order. A rule may be attacked on appeal from a rulemaking proceeding itself, 5 U.S.C. § 704; *see, e.g., Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 530, 98 S.Ct. 1197, 1205, 55 L.Ed.2d 460

(1977); similarly, it may be attacked on appeal from an agency's denial of a petition to modify it, *see* 5 U.S.C. § 553(e). And, a claim that a rule is "arbitrary" might, in an appropriate instance, also be raised in enforcement proceedings, *Buckeye Cablevision, Inc. v. United States*, 438 F.2d 948, 951 (6th Cir. 1971). In this instance, the agency does not object on procedural grounds to Sherwin's attacking the rule in enforcement proceedings. The close relation between this particular set of rules and the "official notice" type of function they serve may provide a special reason for allowing a claimant procedural flexibility when he seeks to show that the facts are *now* such that the agency acts "arbitrarily" in continuing to rely on the Grid.

■ Substantively, however, Sherwin's attacks on the Grid are without merit. He claims that the rules in the Grid are invalid because they are oversimplified. They fail to take account of a variety of factors which are available in the standard "vocational resource materials," and which, Sherwin argues, suggest that jobs classified similarly are in fact quite different. Some require more skill than others. Some require more training time. And, because of their "interests" and "aptitude," different workers will simply be better suited to some jobs than others.

All of this may well be true. And, to that extent, the Grid's rules do "oversimplify" the labor market. But it is in the nature of rules to oversimplify, to group some things together that are not identical in every respect, and to treat similarly some things which for other purposes (or were time and money no object) might be treated differently. The Grid does not assume that a "not disabled" claimant is equally suited to perform *any and all* jobs thought to exist in the national economy for the set of claimants with similar age, education, experience and residual capacity characteristics. It assumes merely that enough jobs are available for such claimants that, in all likelihood, there will be at least some jobs that

each such claimant can perform. Sherwin's "oversimplification" charge in no way undermines the legitimacy of that assumption.

Sherwin's final claim is that the Grid is based on outdated and unreliable information. The Grid, he states, assumes there are some 200 "sedentary unskilled" occupations in the national economy because a Department of Labor publication called the *Dictionary of Occupational Titles* so indicates. But, Sherwin argues, the Grid was based on the third edition of the *Dictionary*. That edition was published in 1965, and Sherwin claims that it was out of date when the Grid was promulgated in 1978.

Without more, however, this claim fails to show the Grid is arbitrary. For one thing, the Grid was based not only on the *Dictionary*, but on several other references as well, such as the *Occupational Outlook Handbook* (published by the Bureau of Labor Statistics), *County Business Patterns* (published by the Census Bureau), *Census Reports* (also published by the Census Bureau), and various labor market surveys prepared by state employment agencies. *See* 20 C.F.R. § 404.1566(d) and App. 2, § 200.00(b); 43 Fed.Reg. 55350–51. It is true, as Sherwin notes, that definitions of the various levels of "residual functional capacity" were taken from the *Dictionary*, and not from these other references. *See* 43 Fed.Reg. 55352–53. But this fact does not make the other references irrelevant. They lend the Grid independent support and specifically show how many jobs of a given type there are, how widely distributed they are, and how easy they are to obtain. 43 Fed.Reg. 55351. The Grid is based on *all* the references that SSA previously used for creating its disability "guidelines." *Id.* For another thing, SSA adopted the Grid only after a substantial effort to "obtain as much public input over as broad a spectrum as possible. . . ." *Id.* at 55356–57. Public meetings were held in three major cities; time was provided after the meetings to receive public comments; notice was given in the Federal Register and sixty days pro-

vided for comment; thirty additional days were provided for comment and announced in both the Federal Register and press releases; groups opposed to the regulations were given access to SSA documents, and allowed to meet with the staffs of both the Commissioner and the Under Secretary of Health, Education and Welfare. *Id.* Thus, in addition to the *Dictionary*, the rules rest on the extensive information gathered in the course of the public debate on the subject. Finally, the fourth edition of the *Dictionary* was not completed until 1981; essential parts of that publication were simply not available when the Grid regulations were prepared and promulgated in 1978. 43 Fed.Reg. 55349, 55351, 55361.

Sherwin adds, however, that when the Grid was proposed and adopted in 1978, the third edition of the *Dictionary* was not only old; he claims it was wrong. The third edition identifies roughly 200 "unskilled sedentary" occupations. But the fourth edition and its supplement (*Selected Characteristics of Occupations Defined in the DOT*, United States Department of Labor (1981)) initially identified only about 20 such occupations. This fact, says Sherwin, shows that the third edition substantially overstated the availability of "sedentary unskilled" jobs in 1978; it also indicates that such jobs have been slowly but surely disappearing from the economy.

We need not consider whether the Grid would be arbitrary, however, if based upon 20 rather than 200 "sedentary unskilled" occupations, for the Department of Labor, which publishes the *Dictionary*, has looked into the matter (the fact that the fourth edition classified only 20 occupations as "sedentary unskilled") and has concluded that in fact there are far more than 20 such job categories. Shortly after the *Selected Characteristics* supplement was published (completing the fourth edition of the *Dictionary of Occupational Titles*), it was amended by a Labor Department letter addressed to "All State Employment Security Agencies." Employment Service Program Letter No. 8–81 (Sept. 3, 1981). The letter reclassified about 200 occupations listed in the fourth edition, stating that they are "sedentary" and any earlier fourth edition classification to the contrary was incorrect. The letter states that some of the earlier misclassification was a result of typographical error. In other instances the data could support either classification and "consistency and continuity with earlier publications" suggested classification as "sedentary." By Sherwin's count, 84 of the reclassified jobs were "unskilled," raising the total number of "sedentary unskilled" occupations to 104. According to the Secretary, more of the reclassified jobs were "unskilled," and the total of "sedentary unskilled" occupations was raised to 130. Yet, whether it is 104 or 130 such occupations that are open to the "sedentary unskilled" worker matters little. To be sure, the numbers have declined from the third to the fourth edition. But, in our view, it has not been shown that the decline was so great that a rule premised on the earlier figures is now without foundation and that a failure to reconsider the rule is "arbitrary." Each of the 104 (or 130) occupations represent many jobs in the national economy. And, although the references are a matter of public record, Sherwin has not given us any reason to believe that these jobs are generally unavailable in his region of the country, 42 U.S.C. § 423(d)(2)(A), do not "exist[ ] . . . in several regions of the country," *id.*, or are for some other reason insufficient to sustain the rule he challenges.

Sherwin suggests that the Labor Department letter resulted from prodding by the SSA, that labor market changes have outdated the Grid, and the SSA (through the Department of Labor) is really just "covering up." Even if the letter did result in part from an SSA complaint, however, it is not thereby tainted. For the SSA to request a review of the publication because its classifications are at odds with prior publications and with SSA definitions is a reasonable thing for an agency to do. Had the Grid been wrong instead of the publication being misleading—had there been an attempt to "cover up" a truly radical de-

cline in the number of occupations suited to "unskilled sedentary" workers—one would expect the record to provide some supporting evidence. Alternatively, one might have expected persons directly concerned or groups representing them to have included such evidence in a petition to have SSA change the Grid, 5 U.S.C. § 553(e). The occupational data underlying the Grid's present classifications is readily accessible in public documents. That no such challenge has yet been made itself suggests the classifications reasonably reflect the present job market. But, even without considering this last factor, for the reasons pointed out, the Agency's failure to modify the Grid is not arbitrary. Sherwin's challenge therefore fails. The decision of the district court is

*Affirmed.*

# APPENDIX

### TABLE NO. 1—RESIDUAL FUNCTIONAL CAPACITY: MAXIMUM SUSTAINED WORK CAPABILITY LIMITED TO SEDENTARY WORK AS A RESULT OF SEVERE MEDICALLY DETERMINABLE IMPAIRMENT(S)

| Rule | Age | Education | Previous work experience | Decision |
|---|---|---|---|---|
| 201.01 .............. ... | Advanced age.............. | Limited or less ............ ... ............ | Unskilled or none.. ..................... | Disabled. |
| 201.02 ....... ......... | ......do ..................... | ... . do .,. ......... .... ...................... | Skilled or semiskilled—skills not transferable [1] | Do. |
| 201.03 .. .............. | ......do ............ ....... | ......do . ................ ... .................. | Skilled or semiskilled—skills transferable [1]. | Not disabled. |
| **Rule** | **Age** | **Education** | **Previous work experience** | **Decision** |
| 201.04 ........ .. ... | Advanced age ............ | High school graduate or more—does not provide for direct entry into skilled work [2]. | Unskilled or none.... ......... .. | Disabled. |
| 201 05. ........... .... | ......do ................... | High school graduate or more—provides for direct entry into skilled work [2] | ...do ...... ...... .......... .. .... .... | Not disabled. |
| 201.06 ...... . ........ | ......do ,.. ................ ... .. | High school graduate or more—does not provide for direct entry into skilled work [2]. | Skilled or semiskilled—skills not transferable [1] | Disabled. |
| 201.07 ................. . | ......do ,.. ................ .. | . ...do . ... .. ... ... .. . ......... | Skilled or semiskilled—skills transferable [1] | Not disabled. |
| 201 08 ................. | ......do ...... ... . .............. | High school graduate or more—provides for direct entry into skilled work [2] | Skilled or semiskilled—skills not transferable [1] | Do. |
| 201.09 ..... ............ | Closely approaching advanced age | Limited or less . ............... ....... | Unskilled or none...... .. ....... | Disabled. |
| 201.10 ... ............. | .. do ......... . ............ | ... do ... .. ...... ....... ............. | Skilled or semiskilled—skills not transferable. | Do. |
| 201.11 ... ............. | ......do ... . .. ............. | . ...do .... .. . ... ............ . . ...... | Skilled or semiskilled—skills transferable. | Not disabled. |
| 201.12 .. ................ | ......do ......... . ........... .. | High school graduate or more—does not provide for direct entry into skilled work [3]. | Unskilled or none ... ....... .. .... | Disabled. |
| 201 13 ................ | ......do ................... ... .. | High school graduate or more—provides for direct entry into skilled work [3]. | ......do . ....... ...... ... ..... | Not disabled |
| 201.14 ... .. .......... | ......do ................. | High school graduate or more—does not provide for direct entry into skilled work [1] | Skilled or semiskilled—skills not transferable | Disabled. |
| 201.15 ..... .............. | ......do .. ......... | . ..do .. .. ...... .. . .......... .. | Skilled or semiskilled—skills transferable. | Not disabled |
| 201.16 ....... ...... .. | ......do .. ................ | High school graduate or more—provides for direct entry into skilled work [3] | Skilled or semiskilled—skills not transferable. | Do |
| 201.17 ........... ...... | Younger individual age 45–49. | Illiterate or unable to communicate in English. | Unskilled or none.. ......... ...... | Disabled. |
| 201 18 ............... .... | ......do ..................... | Limited or less—at least literate and able to communicate in English | .... do ........... ... .. ... ......... .. | Not disabled. |
| 201 19 ...... . ........ | .. do ......... .......... ... | Limited or less ........ ... ........... | Skilled or semiskilled—skills not transferable. | Do. |
| 201 20 ......... .. ....... | ... ..do ...... ............. | ......do ... .. ..... ......... . | Skilled or semiskilled—skills transferable | Do. |
| 201 21 ........ ......... | ......do ..................... | High school graduate or more... | Skilled or semiskilled—skills not transferable. | Do. |
| 201.22 .... .......... | ......do ... ........... | ... . do .... . ...... ............ | Skilled or semiskilled—skills transferable. | Do. |
| 201.23 . ...... .... ... | Younger individual age 18–44. | Illiterate or unable to communicate in English. | Unskilled or none. .. ....... ... . | Do.[4] |
| 201.24 .. ............. | ......do ....... ............. | Limited or less—at least literate and able to communicate in English. | ...do ........ ..: . ......... ... . . | Do.[4] |
| 201.25 .. ............ | ......do ..... ............ | Limited or less.. . ......... ...... | Skilled or semiskilled—skills not transferable. | Do.[4] |
| 201 26 ................... | ......do ....... ............. | ..... do ............ ... ......... ... .. ...... | Skilled or semiskilled—skills transferable | Do.[4] |
| 201 27 ... ............. | ......do ..................... | High school graduate or more... | Unskilled or none... ...... ....... . | Do.[4] |
| 201.28 .. .. ......... | .. ..do .... | ... .. do .... . ........... .. ........... | Skilled or semiskilled—skills not transferable | Do.[4] |
| 201.29 ........ ...... | ......do ..................... | ... . do ..... ... ......... ...... | Skilled or semiskilled—skills transferable. | Do.[4] |

[1] See 201 00(f).   [3] See 201.00(g).
[2] See 201.00(d)   [4] See 201.00(h).