Victor M. ORTIZ, Plaintiff, Appellant,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.

No. 89–1426.

United States Court of Appeals, First Circuit.

Submitted Sept. 15, 1989.

Decided Nov. 29, 1989.

Salvador Medina De La Cruz, on brief, for appellant.

Daniel F. Lopez Romo, U.S. Atty., Hato Rey, P.R., Jose Vazquez Garcia, Asst. U.S. Atty., and John F. Aronson, Asst. Regional Counsel, Region 1, Dept. of Health and Human Services, Cambridge, Mass., on brief for appellee.

Before CAMPBELL, Chief Judge, and BOWNES and BREYER, Circuit Judges.

PER CURIAM.

Victor Ortiz appeals from a district court judgment affirming a decision by the Secretary of Health and Human Services to deny his application for Social Security disability benefits. We find substantial evidence in the record in support of the Secretary's determination and therefore affirm.

### I.

Between February 26, 1981, when his alleged disability started, and June 30, 1986, when his insured status expired, Ortiz suffered from a combination of impairments resulting in both exertional and non-exertional limitations. On that earlier date, while employed as a truck driver and loader, the then–34–year–old claimant injured his lower back in a work accident. He was admitted to the Font Clinic in Puerto Rico and diagnosed as having "lumbosacral sprain." His "strong" back pain eventually subsided with the help of Demerol and other medications, a lumbosacral spine x-ray was negative, and he was discharged on March 5, 1981 in an "improved" condition. Yet over the next five years, Ortiz continued to complain of back pain and occasional numbness in his legs and feet, and he was examined by a succession of neurologists and related specialists.

In September 1981, a physiatrist (Seinz) diagnosed lumbar strain and demonstrated physical therapy exercises for Ortiz to perform at home. An electromyograph on June 22, 1983 suggested right L5 radiculopathy (a lesion or other disease of the nerve root). That diagnosis was confirmed by a treating neurosurgeon (Davila) two months later, who also observed moderate limitation of flexion of the trunk, but found no muscular weakness and said surgery was not then considered. On September 13, 1984, a neurologist (Rodriguez) diagnosed low back painful syndrome due to sacrolumbar myalgias (muscle pain) and recommended that a CT Scan be performed. Another neurologist (Calcano), to whom claimant had been sent by the disability determination program, indicated on October 10, 1984 that he suspected lumbosacral radiculitis and lumbar myositis, and in a second examination one month later reported that Ortiz's ability to bend forward and sideways was limited. A CT Scan was performed on November 20, 1984 and revealed a herniated disc at the L5–S1 intervertebral levels. Ortiz continued receiving pain medications over the next months while he debated whether to undergo surgery. During this period, on February 21, 1985, the Medical Consultant prepared a Residual Functional Capacity ("RFC") assessment indicating that claimant could lift fifty pounds (twenty-five frequently), could stand or sit for six hours per eight-hour day, and could kneel and crouch frequently and stoop occasionally.

On October 16, 1985, Ortiz underwent a right lumbar laminectomy with disc removal, being discharged one week later with a prognosis of "good." This surgery, however, proved to be less than a complete cure. He persisted in his complaints of back pain, and continued to undergo physical therapy and receive pain medications. Based on an examination on March 4, 1986, the Secretary's consulting neurologist (Ulloa) quoted Ortiz as complaining of only "mild" pain which was aggravated by prolonged walking, sitting, or standing. Yet he reported a marked limitation on Ortiz's ability to bend forward (40 degrees as opposed to the normal 90 degrees). Dr. Ulloa

did not prepare an RFC assessment or express an opinion as to claimant's ability to work; his diagnosis was simply "status post lumbar laminectomy." Six months later, and based in part on the Ulloa report, a nonexamining neurologist (Anduze) submitted a second RFC assessment. Dr. Anduze echoed the findings of the Medical Consultant with respect to claimant's lifting, standing and sitting capabilities; he differed, however, in finding that claimant could kneel and crouch, as well as stoop, only occasionally.

Throughout this period, Ortiz also suffered from a depressive neurosis known as dysthymia—a specific affective disorder characterized by "chronic disturbance of mood involving either depressed mood or loss of interest or pleasure in all, or almost all, usual activities." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 220 (3d ed. 1980). He first sought help at a mental health center in August 1981, complaining of suicidal ideas, insomnia, ill-humor, poor memory and strong headaches. These symptoms, he explained, had been present for six years (since the death of his father in a traffic accident) and had intensified in the wake of his back injury and ongoing marital problems. Ortiz was referred to an out-patient clinic for daily therapy sessions, but was discharged six weeks later because of frequent absences and an uncooperative attitude. On a sporadic basis thereafter (first monthly and then twice-yearly), he visited the mental health center to receive therapy and/or medications. He also, between 1984 and 1986, was evaluated by a number of outside psychiatrists. With minor differences, these doctors agreed on Ortiz's basic symptoms: he exhibited anxiety, depression, irritability, low self-esteem and poor interpersonal relations; his attention span, concentration and memory were moderately limited; yet he was oriented, logical and coherent and suffered no delusions or hallucinations. Their evaluations and long-term prognoses, however, diverged rather sharply. Two of the psychiatrists (Miguez, who examined claimant at the disability program's request, and Betancourt) rendered a diagnosis of "severe" dysthymia with sharply impaired occupational functioning and a poor or guarded long-term prognosis. The others (Torres, Keene, Toro and Quinones), along with a psychologist (Iglesia), deemed the dysthymia of only "moderate" intensity, entailing less extreme, if still significant, restrictions on his occupational suitability. A number of these doctors prepared mental RFC assessments, which we shall discuss as the need arises below.

## II.

The ALJ, in an opinion adopted by the Appeals Council and echoed by the district court, applied the full five-step analysis prescribed by 20 C.F.R. § 404.1520 (1988). *See, e.g., Goodermote v. Secretary of Health and Human Services*, 690 F.2d 5, 6–7 (1st Cir.1982). He determined that Ortiz (1) had not worked since his accident, and that his back impairment and mental condition (2) were each "severe" impairments which (3) prevented him from returning to his past relevant work as a truck driver and loader, but which, when considered either individually or in combination, (4) did not meet or equal a listed impairment and (5) did not prevent him from engaging in other substantial gainful employment. Also as prescribed by regulation, 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e)(2), *see, e.g., Lugo v. Secretary of Health and Human Services*, 794 F.2d 14, 17 (1st Cir.1986) (per curiam), the ALJ first analyzed the effects of Ortiz's strength limitations, and then determined to what extent his work capability was "further diminished" by his nonexertional limitations. As to the former, he concluded that his back impairment prohibited "heavy" or "medium" exertion, but did not preclude him from performing the full range of "light" work.[1] Consequently, in light of Ortiz's age ("younger"), education

---

1. "Medium" work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds. 20 C.F.R. § 404.1567(c) (1988).

"Light" work, by contrast, involves lifting a maximum of twenty pounds, ten frequently. *Id.* § 404.1567(b).

("limited or less"), and previous work experience ("semiskilled"), Rule 202.18 of the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App. 2 (the "Grid"), would dictate a finding of not disabled based on the exertional impairment alone. The ALJ next determined that Ortiz's mental impairment prevented him from doing skilled or semiskilled work on a sustained basis, but posed no barrier to the performance of unskilled work. In sum, after considering the combined effects of Ortiz's multiple impairments, the ALJ concluded that he retained the residual functional capacity to engage in light, unskilled work. Citing to the Grid as a "framework" for his decision, see 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e)(2), he determined that these factors warranted a finding of not disabled.

Ortiz now challenges this decision on two grounds. First, he argues that the ALJ's conclusions regarding his back pain—that Ortiz's subjective complaints could be partially discounted, and what pain in fact existed was nondisabling—lacked substantial support in the record. And second, he attacks the ALJ's reliance on the Grid (and the corresponding failure to take other vocational evidence) to support the finding that jobs existed in the national economy that Ortiz retained the capacity to perform. We think it more helpful to analyze separately those impairments that were exertional and those that were nonexertional. We find the ALJ's treatment of the former fully supportable. His treatment of the latter presents a closer question but proves ultimately acceptable.

### III.

As noted above, the ALJ deemed Ortiz's back ailment to be a "severe" impairment which prevented him from performing any work entailing an exertional level of medium or higher. Yet he also found that Ortiz retained the exertional capability to perform light work—a finding that, given

claimant's age, education and work experience, compelled a conclusion of no disability based on exertional grounds alone. See Grid Rule 202.18. The record contains ample support for this finding.

Ortiz argues that his back pain resulted in more severe strength limitations. It is true that the record is replete with his complaints, voiced repeatedly over the relevant period, as to the severity and unremitting nature of such pain. It is also true that there was here "a clinically determinable medical impairment"—his radiculopathy and subsequent herniated disc necessitating a laminectomy—"that can reasonably be expected to produce the pain alleged." Avery v. Secretary of Health and Human Services, 797 F.2d 19, 21 (1st Cir. 1986). Yet the ALJ was justified in deeming his complaints not credible to the degree of severity alleged. The only direct measure of claimant's strength limitations was contained in the RFC assessments of the Medical Consultant and Dr. Anduze. One was prepared before, and the other after, Ortiz's disc operation; each indicated that his exertional capabilities were fully consistent with light work. In addition, Ortiz admitted on several occasions that he spent most days walking in the woods behind his house. He testified at the hearing that he had renewed his driver's license in 1983 because he "didn't feel too bad." And, as mentioned above, he stated to Dr. Ulloa on March 4, 1986 that he was suffering only "mild" pain. Moreover, the ALJ personally observed the claimant at the hearing and noted no "signs of distress or pain" and no "difficulty sitting, standing, or walking." [2] We pay "particular attention" to an ALJ's evaluation of complaints of pain in light of their "subjective nature." Sherwin v. Secretary of Health and Human Services, 685 F.2d 1, 3 (1st Cir.1982), cert. denied, 461 U.S. 958, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983); accord, e.g., Burgos Lopez v. Secretary of Health and Human Services, 747 F.2d 37, 40 (1st Cir. 1984). We accordingly accept the ALJ's

**2.** This hearing was held on March 24, 1987, some nine months after the expiration of claimant's insured status. However, at an earlier hearing before a different ALJ in the summer of

1985, similar conclusions were reached. (That earlier decision, like many others, was rescinded in light of the 1984 Social Security reforms).

determination that claimant's back pain did not preclude on exertional grounds the performance of the full range of light work—a determination that would yield a finding of not disabled under Grid Rule 202.18.

## IV.

 Nonexertional impairments are treated differently under the regulatory scheme. As noted above, under the final test in the five-stage sequential analysis, once a claimant has demonstrated a severe impairment that prohibits return to his previous employment, the Secretary has the burden of proving the existence of other jobs in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(f) (1988). The Grid is designed to enable the Secretary to satisfy this burden in a "streamlined" fashion without resorting to "the live testimony of vocational experts." *Sherwin,* 685 F.2d at 4. Yet the Grid is "predicated on an individual's having an impairment which manifests itself by limitations in meeting the *strength* requirements of jobs...." 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e) (1988) (emphasis added). Accordingly, where a claimant has one or more non-strength limitations, "the Guidelines do not accurately reflect what jobs would or would not be available." *Gagnon v. Secretary of Health and Human Services,* 666 F.3d 662, 665 n. 6 (1st Cir.1981). In cases where a nonexertional impairment "significantly affects claimant's ability to perform the full range of jobs" he is otherwise exertionally capable of performing, *Lugo,* 794 F.2d at 17, "the Secretary must carry his burden of proving the availability of jobs in the national economy by other means," *Gagnon,* 666 F.2d at 665 n. 6, typically through the use of a vocational expert. *See, e.g.,*

*Burkhart v. Bowen,* 856 F.2d 1335, 1340–41 (9th Cir.1988); *Burgos Lopez,* 747 F.2d at 42; *Sherwin,* 685 F.2d at 3. On the other hand, should a nonexertional limitation be found to impose no significant restriction on the range of work a claimant is exertionally able to perform, reliance on the Grid remains appropriate. *See, e.g., Caldarulo v. Bowen,* 857 F.2d 410, 413 (7th Cir.1988); *Rodriguez Pagan v. Secretary of Health and Human Services,* 819 F.2d 1, 3–4 (1st Cir.1987) (per curiam), *cert. denied,* 484 U.S. 1012, 108 S.Ct. 713, 98 L.Ed.2d 663 (1988); *Borrero Lebron v. Secretary of Health and Human Services,* 747 F.2d 818, 818–20 (1st Cir.1984) (per curiam).[3]

*Id.* at 725.

Moreover, even where a nonexertional impairment is significant, the Grid may still be used as "a framework for consideration of how much the individual's work capability is further diminished...." 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e)(2) (1988). Whether, by so invoking the Grid as a "framework," the Secretary can satisfy his burden under step five without resorting to vocational evidence depends on how closely the claimant's characteristics and the Grid criteria overlap. As mentioned above, the Grid is meant to reflect the potential occupational base remaining to a claimant in light of his strength limitations. If a non-strength impairment, even though considered significant, has the effect only of reducing that occupational base marginally, the Grid remains highly relevant and can be relied on exclusively [4] to yield a finding as to disability. Yet the more that occupational base is reduced by a nonexertional impairment, the less applicable are the factual predicates underlying

---

**3.** In *Borrero Lebron,* 747 F.2d at 820, we quoted with approval the following passage from *Smith v. Schweiker,* 719 F.2d 723 (4th Cir.1984):

We cannot believe the grids are formulated to reflect the availability of jobs in the national economy only for physically impaired claimants with "entirely normal" emotional and psychological makeups. If the grids are to serve their intended purpose, we think their use cannot be defeated by low-level personality and emotional disorders that undoubtedly

afflict—at least from time to time—vast numbers of the populace.
*Id.* at 725.

**4.** Despite what might be suggested by use of the word "framework," whenever an ALJ fails to take vocational testimony, he must be deemed "[i]n reality" to have "relied exclusively on the grid to show the existence of jobs claimant could perform." *Figueroa–Rodriguez v. Secretary of Health and Human Services,* 845 F.2d 370, 372 (1st Cir.1988).

the Grid rules, and the greater is the need for vocational evidence. *See, e.g., Sherwin*, 685 F.2d at 3; Social Security Ruling ("SSR"), 85–15, at 93 (CE 1985); SSR 83–14, at 205, 207 (CE 1983).

 The claimant here suffered from two principal nonexertional impairments: (1) a restricted ability to bend from the waist, and (2) a dysthymic disorder.[5] The ALJ, while not addressing the matter explicitly, inferably determined that these ailments, either alone or in combination, were not sufficiently severe to necessitate the taking of vocational testimony. Although the matter is not entirely free of doubt, and although the ALJ's opinion is subject to certain ambiguities, we think the medical evidence was adequate to support such a determination in each instance.

The Secretary has stated that "[a]ny limitation on [the ability to bend from the waist] must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work." *Id.* at 206. In 1984, before claimant's disc operation, Dr. Calca-

no reported that he could bend forward only thirty degrees (out of a maximum of ninety); in 1986, following the operation, Dr. Ulloa, the Secretary's consulting doctor, reported a bending range of only forty degrees. At the same time, the Medical Consultant and Dr. Anduze each reported in their respective RFC assessments (the first prepared before, the other after, claimant's operation) that Ortiz was capable of "occasional" bending. This is all that "light" work requires. *See* SSR 83–14, at 204 ("to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would ... need to stoop only occasionally (from very little up to one-third of the time, depending on the particular job).")). Consequently, the ALJ was justified in finding that Ortiz's bending restriction did not significantly reduce his potential occupational base.

Whether the same can be said of claimant's mental condition presents a closer question, and an interesting wrinkle. The ALJ determined that Ortiz's dysthymic disorder was a "significant mental impairment"[6] that "did not allow the claimant to perform a full range of light work."[7] Or-

---

5. A bending restriction (to which the ALJ made no explicit reference, speaking only of "some limitation of motion" in the back) constitutes a distinct nonexertional limitation. *See, e.g., Frustaglia v. Secretary of Health and Human Services*, 829 F.2d 192, 195 (1st Cir.1987) (per curiam); Social Security Ruling 85–15, at 97. So does an inability to stand or sit for an extended period of time, about which claimant also complained. The ALJ, however, justifiably found these latter complaints unsubstantiated by the evidence; the two RFC assessments described above, for example, each indicated that claimant could stand, sit, or walk for six hours per eight-hour day. We also note that, while pain itself can impose nonexertional limitations, *see, e.g., Gagnon*, 666 F.2d at 666 n. 8, the only such manifestations about which claimant has complained are those just mentioned. Consequently, only the bending restriction need be examined further.

6. A certain ambiguity attends the ALJ's assessment of the severity of claimant's dysthymia. He quite obviously (given that he proceeded to step five in the disability analysis) equated the term "significant" with a finding of a "severe" impairment under step two. Yet his checkmarks on an "impairment severity" form seemingly contradict such a finding. Pursuant to 20 C.F.R. § 404.1520a, the ALJ is directed to evaluate a mental impairment by rating the degree of

functional loss in four areas: (1) restriction of activities of daily living; (2) difficulties in maintaining social functioning; (3) deficiencies of concentration, persistence, or pace; and (4) episodes of deterioration or decompensation in work or work-like settings. The ALJ's ratings in these four areas were slight, slight, seldom and never—ratings that "generally" indicate a nonsevere impairment. *Id.* § 404.1520a(c)(1); *see Figueroa–Rodriguez*, 845 F.2d at 372–73. Yet the evidentiary support for such findings is sparse. The only two doctors to submit this same form had ratings consistent with a "severe" impairment: Dr. Iglesia rated the first three categories as moderate, moderate, and seldom; Dr. Quinones rated all three at the moderate level. And Dr. Betancourt submitted a similar form finding moderately severe to severe functional loss. Accordingly, we accept the ALJ's description of Ortiz's dysthymia as a "severe" impairment and disregard his conflicting impairment severity ratings.

7. The ALJ on several occasions indicated that Ortiz's mental impairment restricted his ability to perform the "full range" of light work—by preventing him, as we shall discuss, from performing anything other than unskilled work. Yet in his Finding No. 12 he stated, "Through June 30, 1986, the claimant's capacity for the full range of light work was not significantly

dinarily, as explained above, such a finding would render the Grid inapplicable and necessitate the use of vocational testimony. Here, however, the ALJ managed to finesse the point by concluding that claimant's mental disorder affected only the occupational skill level at which he could operate. Although his dysthymia, particularly the associated "anxiety, depression and irritability," prevented him from performing any sort of skilled or semiskilled work, "the claimant was capable of engaging in unskilled, routine, repetitive work on a sustained basis." Therefore, by combining the effects of the separate exertional and nonexertional impairments, the ALJ concluded that Ortiz retained "the total residual functional capacity for light type unskilled work." And since the Grid included occupational skill level as one of its criteria, the specific Grid rule reflecting Ortiz's age and education in the light, unskilled work classification could be invoked—at least as a "framework"—to support a finding of not disabled.[8]

We think such a shorthand approach is permissible, so long as the factual predicate (that claimant's dysthymia does not interfere more than marginally with the performance of the full range of unskilled work) is amply supportable. The Grid of course includes skill level as one of its criteria, looking at the level of skill involved in a claimant's "previous work experience" in order to gauge future work capacity. *See* 20 C.F.R. § 404.1565(a) (1988) (the kind of work an individual has "already been able to do shows the kind of work that [he] may be expected to do"). A finding that a mental impairment relegates a claimant to unskilled work provides another, equally valid means of making that prediction. Moreover, the Grid rules are directly premised on the availability of jobs at the unskilled level: the "table rules reflect the potential occupational base of *un-*

*skilled* jobs for individuals who have severe impairments which limit their exertional capacities...." SSR 85–15, at 92 (emphasis added). In fact, the regulations take explicit administrative notice of the existence of "[a]pproximately 1600 separate sedentary and light *unskilled* occupations ...in eight broad occupational categories, each occupation representing numerous jobs in the national economy." 20 C.F.R. Part 404, Subpart P, App. 2, § 202.00(a) (1988) (emphasis added). Consequently, so long as a nonexertional impairment is justifiably found to be substantially consistent with the performance of the full range of unskilled work, the Grid retains its relevance and the need for vocational testimony is obviated.

In the case of mental impairments, this inquiry actually entails two separate determinations: (1) whether a claimant can perform close to the full range of unskilled work, and (2) whether he can conform to the demands of a work setting, regardless of the skill level involved. As to the former, the Secretary has outlined the mental capabilities required for unskilled work as follows:

> The basic mental demands of competitive remunerative unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.

SSR 85–15, at 94. He has also emphasized that gauging an individual's "capacity to do at least unskilled work ...requires careful consideration of the assessment of RFC." *Id.* Four doctors (Betancourt, Keene, Quinones and Iglesia) submitted RFC forms evaluating the above factors in Ortiz's

---

compromised by his additional nonexertional limitations." Plainly, the ALJ meant that the nonexertional impairments—aside from relegating Ortiz to unskilled jobs—did not otherwise significantly compromise such capacity for light work.

**8.** The particular rule reflecting light, unskilled work for a younger individual with limited education is Rule 202.17. The ALJ for unexplained reasons invoked as a framework Rule 202.18, which involves skilled or semiskilled work. Both rules, however, yield the same finding of not disabled.

case, with divergent results. While the ALJ did prepare a "Rating of Impairment Severity" form, see note 6 supra, his decision contains no "careful consideration" of the RFC reports. Nonetheless, it is apparent that he rejected the more dire assessments contained in the Betancourt and Keene reports,[9] relying instead on the RFC's of Drs. Quinones and Iglesia. And on the basis of those reports, the ALJ was justified in concluding that Ortiz's abilities in the work-related activities described above were largely unimpaired.

To review the Quinones and Iglesia reports briefly, we observe that both doctors rated as "not significantly limited" the ability of claimant: (1) to understand, remember and carry out simple instructions; (2) to accept instructions and respond appropriately to criticism from supervisors; and (3) to sustain an ordinary routine without special supervision. Quinones found the ability to get along with coworkers to be moderately limited, but Iglesia deemed it not significantly so. And while Iglesia found a moderate limitation on claimant's ability to respond appropriately to changes in the work setting, Quinones found no evidence of limitation in that category. In summary, as to each of the "basic mental demands" of unskilled work enumerated by the Secretary, a finding of no significant restriction was offered by at least one of these doctors. In terms of such mental demands, therefore, we think the ALJ was justified in concluding that claimant's dysthymia did not preclude performance of substantially the full range of unskilled work.

The related inquiry, rather than involving skill level, concerns a claimant's ability to accommodate the demands of a work setting per se. The Secretary has indicated that the mentally impaired "may cease to function effectively when facing such demands as getting to work regularly . . . and remaining in the workplace for a full day," and he has emphasized in this regard "the importance of thoroughness in evaluation on an individualized basis." SSR 85–15, at 96. Ortiz's dysthymia appears to have had more of an impact in this context. Drs. Quinones and Iglesia, in findings that correspond in part to those of Dr. Keene, each reported that claimant was "moderately limited" in his ability: (1) to maintain attention and concentration for extended periods; (2) to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and (3) to complete a normal workday without unreasonable interruptions. The claimant's diminished ability to maintain attention and concentration also was reported by (among others) Dr. Miguez, the Secretary's consulting psychiatrist, and was mentioned by the ALJ, who otherwise did not address these manifestations of claimant's dysthymia.

In light of these "moderate" restrictions, we think that claimant's potential occupational base was eroded at least marginally, and possibly more so. At the same time, we agree with the ALJ's conclusion that, apart from his being relegated to jobs of an unskilled nature, "the claimant's capacity for the full range of light work was not *significantly* compromised by his additional nonexertional limitations." On balance, while we find the question a close one, and while we would have preferred something more than the cursory attention given to the matter below, we think the exclusive reliance on the Grid here was supportable. Bolstering our determination in this regard

**9.** Dr. Betancourt's evaluation was the bleakest. He characterized claimant's dysthymia overall as moderately severe to severe with a poor long-term prognosis. He rated as "poor" claimant's ability to perform simple or repetitive tasks on a sustained basis, and as "fair" his ability to follow instructions. He also indicated that Ortiz lacked the capacity to sustain attention and perform routine repetitive activities, tolerate the work pressure generally associated with production requirements of unskilled work, adjust to a competitive work situation, or tolerate criticism. Moreover claimant could retain or carry out instructions only "at times."

Dr. Keene's assessment was somewhat less dire. He rated as "limited but satisfactory" Ortiz's ability to deal with work stresses, maintain concentration, and remember and carry out simple job instructions. At the same time, he found "seriously limited" the capacity to relate to coworkers, interact with supervisors, deal with the public, and remember and carry out detailed instructions.

is the fact that claimant's characteristics did not position him near the disabled/not disabled dividing line under the Grid rules; even had he been illiterate, the Grid would have directed a finding of not disabled. *See* Rule 202.16.

For the foregoing reasons, we affirm the judgment of the district court. At the same time, we emphasize that this is an unusual instance where reliance on the Grid is permissible despite the existence of a significant nonexertional limitation. We caution that an ALJ typically should err on the side of taking vocational evidence when such a limitation is present in order to avoid needless agency rehearings. And should an ALJ determine that the Grid can be relied on in such a case, we urge that the evidentiary support for that decision be enumerated more clearly and in greater detail than was done here in order to avoid needless remands for subsidiary fact-finding.

*Affirmed.*