February 12, 1993
NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1946

JESUS M. PENALOZA-CLEMENTE,

Plaintiff, Appellant,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Raymond L. Acosta, U.S. District Judge]

Before

Breyer, Chief Judge,

Selya and Cyr, Circuit Judges.

Raymond Rivera Esteves and Juan A. Hernandez Rivera on brief for

appellant.
Daniel F. Lopez Romo, United States Attorney, Jose Vazquez

Garcia, Assistant United States Attorney, and Donna C. McCarthy,

Assistant Regional Counsel, Department of Health and Human Services,
on brief for appellee.

Per Curiam. Jesus Penaloza Clemente ("Penaloza")

applied for Social Security disability benefits, alleging

disability due to back and leg injury and nerves. In a

Disability Report, he further stated that he suffered from

high blood pressure. After a hearing, the ALJ denied his

claim, but the Appeals Council vacated the decision and

remanded for further testimony on pain. After a supplemental

hearing, the ALJ again denied Penaloza's application. The

ALJ found that Penaloza had severe hypertension, which was

controlled with medication, and that he had undergone

arthroscopic removal of torn cartilage in both knees before

March 31, 1988, the date when his disability coverage

expired, but that those conditions did not meet or equal any

listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Although the ALJ determined that Penaloza had "mild to

moderate occasional pain" in both knees, he concluded that

the pain was relieved by medication and that the pain did not

reduce Penaloza's residual functional capacity. Penaloza

could not return to his former work as security guard since

he could not stand or walk for more than two hours during an

eight-hour work day and could not use his legs for constant

repetitive movement. However, the ALJ concluded that

Penaloza could sit and use his arms without limitation.

Finding that Penaloza had no nonexertional limitations, that

he could perform sedentary work, and that his vocational

attributes fit the criteria of Rule 201.25 in Appendix 2 of

the regulations, the ALJ determined that Rule 201.25 directed

a conclusion that Penaloza was not disabled. Penaloza

appealed the ALJ's denial of benefits to the district court,

which affirmed the ALJ's decision. He then sought review in

this court. We affirm.

I. Allegations of Pain

Penaloza does not challenge the ALJ's determination

that his knee condition and hypertension did not meet or

equal any listing in the regulations. He claims, however,

that the ALJ failed to consider his allegations of pain,

asserting that he complained "constantly and persistently to

the examining physicians of severe disabling pain." In his

decision, the ALJ noted that Penaloza did have knee pain

during the coverage period as a result of a fall that

occurred on April 24, 1987. The ALJ found that Penaloza's

pain responded to treatment, however, and that as of April 6,

1988, one week after Penaloza's coverage expired, Penaloza

was experiencing no pain when his knees were palpated. The

ALJ further characterized the pain that Penaloza had suffered

to be of "moderate character" which was relieved by physical

therapy and "mild analgesics of a non-narcotic character

which did not cause any side effect[s]." Apparently on the

basis of Penaloza's testimony at the hearings, the ALJ also

found that Penaloza "may experience discomfort and mild to

-3-

moderate pain on an occasional basis and it [is] relieved by

the use of non-narcotic analgesics." Penaloza's medical

records fully support the ALJ's findings as to the nature of

Penaloza's pain for the period before his coverage expired.

The records document that Penaloza complained of pain to

examining physicians and to his physical therapist a number

of times after his fall. His complaints occurred even after

the torn menisci (fibrocartilage) in both knees were removed

arthroscopically. In all instances but one, however, the

reports state merely that he reported "pain" or "discomfort"

or that one or the other of his knees "hurt." Only once, in

October 1987, within weeks of his surgery, did he report

"intense pain," and that was to his physical therapist about

his right knee. The pain appears to have resulted from the

specific exercise he was performing during therapy that day.

A subsequent report in November 1987 stated that he had full

range of movement in both knees "without pain." The records

contain no further report of pain in his right knee, although

in December 1987 he reported to his physical therapist that

the pain in his left knee had increased and in January 1988

he reported to the therapist that his left knee "continues to

hurt." For the two-month period between the end of January

and expiration of his coverage on March 31, 1988, however,

there are no further reports of pain. On April 6, 1988, his

physician reported that he had "no pain on palpation."

-4-

Most of Penaloza's testimony during the hearings in

October 1989 and June 1990 described the pain he was

experiencing at that time. Since he had reinjured his knees

in a fall on March 30, 1989, before the hearings and a year

after his coverage had expired, that testimony is of little

relevance in determining his degree of pain during the

coverage period. (The ALJ did consider that testimony,

however, and determined, as the above summary of his findings

indicates, that at the time of the hearings Penaloza was

experiencing occasional mild to moderate pain which was

relieved by analgesics.)

Some of Penaloza's testimony did describe his pain

during the coverage period after his first fall in April

1987. Penaloza explained "that a toothache would be more or

less the same" as the pain he then experienced. When asked

to describe the intensity of the pain, he stated that it was

"a continuous pain, very strong." He further testified that

he told his doctor that he "could no longer stand the pain,"

and that his doctor then recommended the menisectomy, or

arthroscopic removal of menisci, which was performed in

October 1987. As noted above, although Penaloza continued to

report pain after the surgery, he last reported pain in

January 1988, and, by April 1988, he experienced no pain in

either knee. At the hearings, Penaloza also testified that

he needed a cane to walk, and that he had received a cane

-5-

from the State Insurance Fund. The medical records show

that, several weeks after he fell, he received a prescription

for a wheelchair from the Fund, but not that a cane was ever

prescribed or determined to be medically necessary (the

medical reports note, however, that he came to appointments

using a cane).

At the hearings, Penaloza identified Motrin as one

of the medications he was then taking and stated that it

relieved his pain "all the time." At the first hearing, the

ALJ also named two other medications -- Indocin and Medrol --

as being on a list that Penaloza had submitted to him.

Motrin is a non-narcotic anti-inflammatory analgesic used to

reduce swelling and pain. See Houts, Baselt & Cravey,

Courtroom Toxicology (1992) (under "Ibuprofen"). Indocin is

an anti-inflammatory analgesic, see The Sloane-Dorland

Annotated Medical-Legal Dictionary 373 (1987), and Medrol is

an anti-inflammatory, see Dorland's Illustrated Medical

Dictionary 993, 1028 (27th ed. 1988). Although Penaloza

testified that the pain "does not disappear completely," he

confirmed that the medication made it possible for him to

move around. At the first hearing he suggested that an

unidentified medicine which he took at night to "relax" may

have caused him some sleeplessness, but that otherwise he

suffered no side effects from his medications. At the second

hearing, he testified that some medications -- he may have

-6-

been referring to Medrol and Indocin which were the only

medications named besides Motrin -- caused nausea, but no

drowsiness. At the hearings, Penaloza did not identify the

medications he took during his coverage period, but in an

undated document entitled "Claimant's Statement When Request

for Hearing is Filed", filled out presumably in 1989 when

Penaloza requested a hearing, Penaloza identified the

following medications as the prescription drugs he was taking

at that time: Feldene, Tolectin, Naprosyn, Flexeril,

Clinoril, and Minipress.1 With the exception of Minipress

and Flexeril, all of those drugs are anti-inflammatory

analgesics.2 See id. (under "Piroxicam", "Tolmetin",

"Naproxen", and "Sulindac"). Unfortunately, the

prescriptions given in the medical records for the period of

coverage are often illegible, but the following are

identifiable: Motrin, Feldene, Naprosyn, Indocin,

Butazolidin, Darvocet, and Clinoril. Darvocet is a "mildly

effective narcotic analgesic" used to relieve "mild to

moderate pain." See Courtroom Toxicology, supra (under

"Propoxyphene). Butazolidin is an anti-inflammatory

1. Penaloza also identified "Asolid", but it appears not to
be referenced in the Physicians Desk Reference or in
Penaloza's medical records.

2. Minipress is a hypertension drug, see Courtroom

Toxicology, supra (under the entry "Prazosin"), and Flexeril

is a skeletal muscle relaxant used for relief of muscle
spasms associated with acute, painful muscoskeletal
conditions, see id. (under "Cyclobenzaprine").

-7-

analgesic. See Dorland's Illustrated Medical Dictionary,

supra, at 248, 1278.

Thus, the medical record and Penaloza's testimony

provide substantial evidence for the ALJ's conclusion that

Penaloza's pain during the coverage period had been

"moderate" and that it had been relieved by physical therapy

and analgesics by the time his coverage expired. In support

of his conclusion that Penaloza's pain had been relieved by

analgesics of a "non-narcotic character," the ALJ

specifically identified records from the coverage period

which prescribed Butazolidin, Feldene, Motrin and Naprosyn.

(He also referred to the Claimant's Statement which listed

the medications taken in 1989 and an exhibit listing

medications taken in 1990, including Indocin.) As stated

above, Motrin is a non-narcotic analgesic, which provided

Penaloza the greatest pain relief, at least as of the time

the hearings were held. The other analgesic drugs the ALJ

referred to all appear to have been non-narcotic as well.

Although the ALJ did not mention Darvocet, which is a

narcotic analgesic, that medication appears to have been

prescribed only once when Penaloza began physical therapy.

The ALJ also stated that the analgesics Penaloza

took had no side effects. His conclusion is supported by the

medical records, which contain no report of any side effects.

Although Penaloza testified to some side effects during the

-8-

hearings, his testimony was not very probative. It concerned

medications administered during 1989 and 1990 and did not

identify which medications had caused the side effects. In

addition, although some of those medications had been

prescribed during the coverage period, the testimony on

adverse side effects can fairly be said to have implicated

only Indocin, which was named during the second hearing and

was also prescribed once during the period of coverage.

The ALJ's decision made no reference to the back

injury which Penaloza claimed disabled him during the

coverage period. However, after discussing evidence of

Penaloza's knee injuries, pain and high blood pressure, the

ALJ commented that the remaining evidence related only to the

time after Penaloza's coverage had expired. Because the

medical records for the coverage period contain no reports of

back pain or evaluation of any back condition, we infer that

the ALJ considered and rejected Penaloza's claim of

disability due to back injury or pain. In the recitation of

facts in his appellate brief, Penaloza describes a medical

record from June 1988, which refers to "disabling painful

residuals, specially of the back." But the ALJ did not err

in not considering that record. Not only does the record

describe a condition existing three months after Penaloza's

coverage expired, but, more importantly, it appears to refer

to a different patient altogether. The patient with the

-9-

painful back had also had his legs amputated, and thus could

not have been Penaloza. A record from July 1988 further

indicates that the records of a patient with a back condition

had inadvertently been placed in Penaloza's file, and the

June 1988 report is likely to have been that record. The

medical records which do describe Penaloza's back condition

all pertain to evaluations made months after expiration of

the coverage period.

At his first hearing, Penaloza stated that he had

complained to his physical therapist of back pain. Although

his testimony suggests that his complaints had occurred

during therapy in 1987 during the coverage period, he also

stated that the therapy took place at the "Medical Center".

But he was not treated at the Medical Center until 1989,

after expiration of the coverage period. Furthermore, the

physical therapist's notes from 1987 reflect Penaloza's

complaints of knee pain, but do not mention that he ever

complained of back pain. Therefore, the record amply

supports the conclusion that Penaloza did not suffer from a

disabling back injury or pain during the coverage period.

II. Appropriateness of Sedentary Work

Penaloza argues that the ALJ's determination that

he could perform sedentary work was wrong because it had not

been shown that he could perform sedentary work "without

serious aggravation to his present physical impairment."

-10-

Penaloza does not state whether he means his hypertension or

his knee condition by the term "physical impairment."

However, as long as the finding that Penaloza could perform

sedentary work is consistent with the evidence about

Penaloza's residual functional capacity ("RFC"), presumably

sedentary work would not aggravate either condition.

The record contains substantial support for the

ALJ's conclusion that Penaloza could safely perform sedentary

work as of March 31, 1988. Three uncontradicted RFC

assessments by non-examining Social Security physicians are

in the record, one evaluating Penaloza's hypertension, the

other two his knee condition. Penaloza submitted no RFC

assessment, although the ALJ gave him opportunity to do so.

The report assessing Penaloza's RFC in view of his

hypertension stated: "Diagnosis hypertension. Hospitalized

in Jan '88 because of hypertensive crisis. Rt hemiplegia

described but no detailed neurologic exam. No CT of the

brain. More recent evaluation = no neurologic deficit. EKG

= left axis deviation. Non specific ST-T changes. Chest x

Ray = cardiomegaly. Heavy work activity should be precluded.

RFC: medium work."3 The assessment also evaluated

3. The RFC mistakenly states that Penaloza's hypertensive
crisis occurred in January 1988, which would have been during
the coverage period. The consulting physician's confusion
undoubtedly arose because some of the handwritten records
relating to Penaloza's hospitalization erroneously give
January 5, 1988 as his hospitalization date. Other records,
including some stamped by a dating device, which are

-11-

Penaloza's exertional capabilities by checking appropriate

spaces on the RFC form. It indicated that, despite strength

limitations imposed by his hypertension, Penaloza could lift

and carry 50 pounds and frequently lift and carry 25 pounds,

and that he could stand, walk and sit about six hours per

eight-hour day and push or pull up to 50 pounds using either

foot or hand controls. According to the assessment,

Penaloza's hypertension did not affect his ability to climb,

balance, stoop, kneel, crouch, crawl or engage in fine motor

activities.

On March 1, 1989, Dr. Irizarry Rivera described

Penaloza's knee condition as follows: "Bilateral torn

menisci. [B]oth knees repaired arthroscopically by 10/87.

[T]reated [with] physic[al] therapy, had recurrent knee

effusions which subsided by 4/88 & painless knees." He

assessed Penaloza's strength limitations by checking the

appropriate spaces, concluding that Penaloza retained the

capacity to lift and carry up to 50 pounds, to frequently

lift and carry up to 25 pounds, to sit, stand and walk about

interspersed with the erroneous handwritten records, make
clear that the hypertensive crisis occurred on January 5,
1989, after the coverage period had expired. (The
handwritten error appears to reflect the fact that a new year
had just begun and the person writing down the date had not
yet become accustomed to writing "1989".) The "more recent
evaluation[s]", including the results of the EKG and chest X-
ray, which were referred to in the RFC, actually predated
Penaloza's hypertensive crisis and were within the coverage
period.

-12-

six hours per eight-hour day, and to push and pull using foot

controls up to "50/25 [pounds]." (By implication, Penaloza's

ability to push and pull hand controls was unlimited.) Dr.

Irizarry further indicated that Penaloza could balance and

stoop frequently, although he could climb, kneel, crouch and

crawl only occasionally, and that his fine motor skills

(reaching, handling, fingering, feeling) were unimpaired. On

June 14, 1989, Dr. Acevedo Defillo described Penaloza's knee

condition in almost the same words as Dr. Irizarry. His

assessment of Penaloza's physical capacity was essentially

the same as Dr. Irizarry's except that he found that Penaloza

could push and pull both hand and foot controls "[t]o 50 lbs

max." Dr. Acevedo also found that Penaloza could balance and

stoop frequently, and climb, kneel, crouch and crawl only

occasionally. He found Penaloza's fine motor skills to be

unimpaired. Thus, there was basic agreement between the two

assessments as to what Penaloza's RFC was in light of his

knee condition.

The ALJ found Penaloza's residual functional

capacity to be more restricted. He determined that Penaloza

could perform only sedentary work. The difference in the

physicians' evaluations and the ALJ's appears to be based on

Penaloza's testimony describing the factors which

precipitated pain in his legs, evidence not considered by the

consulting physicians who reviewed only the medical records.

-13-

In his decision, the ALJ stated that "constant or frequent

lower extremity movement would precipitate the pain, as also

would . . . standing or walking for prolonged periods of

time." Essentially, then, the ALJ's conclusion that Penaloza

could perform sedentary work implies his determination that

sedentary work would not aggravate Penaloza's knee condition.

The ALJ could not himself have assessed the effect of

sedentary work on Penaloza's hypertension since Penaloza did

not testify as to any work-inhibiting symptoms arising from

his hypertension. Presumably, however, since Penaloza had

been evaluated by a physician as having the RFC to perform

medium work despite his hypertension, it can be assumed that

the performance of sedentary work would not exacerbate

Penaloza's hypertension. Cf. 20 C.F.R. 404.1567(c) ("If

someone can do medium work, we determine that he or she can

also do sedentary and light work.").

In any event, the physicians' assessments provide

support for the ALJ's determination that Penaloza could

perform sedentary work. The regulations define sedentary

work as work involving sitting, with occasional standing and

walking, and lifting no more than 10 pounds at a time, with

occasional lifting or carrying of articles like docket files,

ledgers, and small tools. 20 C.F.R. 404.1567(a). Social

Security Ruling 83-10 defines "occasionally" to mean

"occurring from very little up to one-third of the time," so

-14-

that periods of standing or walking at the sedentary

exertional level should comprise no more than about two hours

per eight-hour work day and sitting would comprise the

remaining six hours. The Ruling also states that most

unskilled sedentary jobs "require good use of the hands and

fingers for repetitive hand-finger actions." SSR 83-10,

reprinted in [Rulings 1983-91] West's Social Security

Reporting Service, at 29. The performance of sedentary work

is well within the strength limitations indicated in all

three RFC assessments, accordingly, and involves primarily

hand and finger skills which Penaloza is capable of

performing without limitation.

Certain non-strength limitations were also

described in the knee RFC assessments. Penaloza was stated

to be able to climb, kneel, crouch and crawl only

occasionally. But even those limitations appear to be

consistent with the performance of sedentary work, in which

the ability to sit predominates, with only occasional walking

and standing. Furthermore, the Rulings indicate that the

ability to climb, kneel, crouch and crawl would most likely

be infrequent, but certainly no more than occasional

activities in sedentary work. Ruling 83-14 states that

"[r]elatively few jobs in the national economy require

ascending or descending ladders and scaffolding" and that "to

perform substantially all of the exertional requirements of

-15-

most sedentary . . . jobs, a person would not need to crouch

. . . ." See id. at 44. Similarly, Ruling 85-15 indicates

that crawling is an "extremely rare factor" in sedentary

work, that some limitation in climbing would not ordinarily

have a "significant effect on the broad world of work," and

that a limitation on kneeling "would be of little

significance in the broad world of work." See id. at 93, 97.

Accordingly, we conclude that there is substantial evidence

in the record to show that, as of the date Penaloza was last

insured, the performance of sedentary work would not

aggravate his hypertension or knee condition.

III. Exclusive Reliance on the Grid

The ALJ stated in his findings that Penaloza had no

nonexertional limitations, and he therefore relied

exclusively on Rule 201.25 of the Grid (20 C.F.R. Part 404,

Subpart P, Appendix 2) to determine that Penaloza was not

disabled. According to Penaloza, the ALJ erred since he had

nonexertional limitations, consisting "mainly of pain" and

his use of a cane which would make it impossible to carry

work materials while walking. As a result, Penaloza avers,

the ALJ could not rely exclusively on the Grid.

We find no error in the ALJ's reliance on the Grid

insofar as pain and Penaloza's use of a cane are concerned.

Under the regulations, the determination whether pain is

exertional or nonexertional depends upon the precise aspect

-16-

of physical functioning that is affected by the pain. See 20

C.F.R. 404. 1569a(a)-(c). Pain is an exertional impairment

when it affects strength requirements, such as sitting,

standing and walking. See id. (a). It is nonexertional when

it affects requirements such as mental, manipulative or

postural work function. See id. (c)(1). Penaloza's

testimony at the hearings attempted to establish that his

knee and back condition and related pain precluded him from

sitting, standing or walking. Consistent with Penaloza's own

approach, the ALJ determined that Penaloza's knee condition

affected his ability to stand and walk (but not to sit), and

the ALJ found that Penaloza could not return to his former

work as a security guard which required considerable standing

and walking, but that he could perform sedentary work. Thus,

the record fully justified the ALJ's treatment of Penaloza's

pain as an exertional limitation. Nor was Penaloza's alleged

use of a cane a nonexertional limitation since it affected

his ability to carry work materials, and carrying is an

exertional function. See id. (a).

Although Penaloza does not point to other

nonexertional limitations, the RFC assessments by Drs.

Irizarry and Acevedo indicated that Penaloza's ability to

climb, kneel, crouch and crawl was limited by his knee

condition. Climbing, kneeling, crouching and crawling are

nonexertional postural functions, see id. (c)(1)(vi), which,

-17-

normally, would preclude exclusive reliance on the Grid.

Nevertheless, the ALJ's reliance on the Grid is supportable

here. As Rulings 83-14 and 85-15 make clear, those functions

are rarely required in sedentary work. Moreover, Penaloza is

not completely prohibited from climbing, kneeling, crouching

and crawling, but may in fact engage in those activities

occasionally. Consequently, Penaloza's nonexertional

limitations would not significantly erode his occupational

base, and the ALJ was entitled to rely exclusively on the

Grid. See Ortiz v. Secretary of Health and Human Services,

890 F.2d 520 (1st Cir. 1989) (the Grid may be relied on

exclusively to yield a finding as to disability if a

nonexertional impairment, even a significant one, has the

effect only of reducing the occupational base marginally).

Although the ALJ did not expressly determine, as he

should have, that those nonexertional limitations did not

significantly erode Penaloza's occupational base, that

determination may be inferred from his analysis of the

severity of Penaloza's knee condition. The ALJ determined

that, at the time Penaloza's coverage expired, both of

Penaloza's knees showed good muscular strength with no

swelling, heat or pain, that when he had pain it responded to

medication and therapy, that therapy had increased his range

of motion, and that his condition would not keep him from

pursuing recreational activities or light household

-18-

maintenance. However, the ALJ also concluded that Penaloza

could not use his lower extremities for "constant repetitive

movements," which clearly would encompass climbing, kneeling,

crouching and crawling. In Frustaglia v. Secretary of Health

and Human Services, 829 F.2d 192 (1st Cir. 1987), we

concluded in a similar situation that an ALJ could rely

exclusively on the Grid. In Frustaglia, the nonexertional

limitation at issue was bending, the ALJ had found that the

claimant could perform the full range of light and sedentary

work although he could not engage in repeated bending, and

Rulings indicated that bending was only an occasional

requirement in light and sedentary work. We stated that "by

definition [repeated bending] is a more strenuous mode than

occasional activity" and that "[i]t is fairly obvious that

such a restriction would have very little effect on the

ability to perform the full range of work at either the light

or sedentary level." Id. at 195. Similarly, here the ALJ

found that Penaloza could not engage in repetitive leg

movements, which would include climbing, crouching, crawling

and kneeling, and the Rulings make it "fairly obvious" that a

limitation permitting the occasional performance of those

activities would have little effect on Penaloza's ability to

perform substantially all requirements of sedentary work.

Accordingly, although it would have been preferable for the

ALJ to have expressly found that Penaloza's postural

-19-

limitations did not significantly erode his occupational

base, and to have supported his finding by reference to the

record or Rulings, under the circumstances his failure to do

so does not require remand.

IV. Remaining Claims

Penaloza also appears to claim that the ALJ failed

to take into account the combined effects of his mental and

physical conditions. Penaloza's first visit to a mental

health clinic was at his attorney's suggestion some six

months after the coverage period had expired. Thus, there

was substantial evidence to support the ALJ's determination

that Penaloza was not disabled by any nervous or mental

condition, and so there was no need to consider how such a

condition, when combined with Penaloza's physical

impairments, affected his capacity for substantial gainful

employment. Moreover, the text of the ALJ's decision

indicates that he considered the combined effects of

Penaloza's physical conditions and pain. He drew the

conclusions he did about Penaloza's physical capabilities

after "considering the claimant's musculoskeletal and

hypertensive condition plus the above described discomfort

and mild to moderate pain."

Penaloza also alleges that the ALJ cited only

evidence favorable to the Secretary, disregarded the medical

evidence of his disability, and based the disability

-20-

determination on his own medical opinion. He provides no

detail as to what evidence the ALJ allegedly disregarded, and

does not describe in what respect the ALJ ignored the

opinions of examining or consulting physicians, or otherwise

based his disability determination on his own medical

opinion. We have reviewed the ALJ's decision and the record

and find no error of the kind Penaloza has alleged. The

ALJ's determination that Penaloza could perform sedentary

work ascribes a functional capacity to Penaloza which is well

within the limitations described in the uncontradicted RFC

assessments of record.

The decision of the district court is affirmed.

-21-