USCA1 Opinion

 

 February 12, 1993 NOT FOR PUBLICATION UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1946 JESUS M. PENALOZA-CLEMENTE, Plaintiff, Appellant, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Raymond L. Acosta, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Selya and Cyr, Circuit Judges. ______________ ____________________ Raymond Rivera Esteves and Juan A. Hernandez Rivera on brief for ______________________ _________________________ appellant. Daniel F. Lopez Romo, United States Attorney, Jose Vazquez _______________________ _____________ Garcia, Assistant United States Attorney, and Donna C. McCarthy, ______ __________________ Assistant Regional Counsel, Department of Health and Human Services, on brief for appellee. ____________________ ____________________ Per Curiam. Jesus Penaloza Clemente ("Penaloza") __________ applied for Social Security disability benefits, alleging disability due to back and leg injury and nerves. In a Disability Report, he further stated that he suffered from high blood pressure. After a hearing, the ALJ denied his claim, but the Appeals Council vacated the decision and remanded for further testimony on pain. After a supplemental hearing, the ALJ again denied Penaloza's application. The ALJ found that Penaloza had severe hypertension, which was controlled with medication, and that he had undergone arthroscopic removal of torn cartilage in both knees before March 31, 1988, the date when his disability coverage expired, but that those conditions did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. Although the ALJ determined that Penaloza had "mild to moderate occasional pain" in both knees, he concluded that the pain was relieved by medication and that the pain did not reduce Penaloza's residual functional capacity. Penaloza could not return to his former work as security guard since he could not stand or walk for more than two hours during an eight-hour work day and could not use his legs for constant repetitive movement. However, the ALJ concluded that Penaloza could sit and use his arms without limitation. Finding that Penaloza had no nonexertional limitations, that he could perform sedentary work, and that his vocational attributes fit the criteria of Rule 201.25 in Appendix 2 of the regulations, the ALJ determined that Rule 201.25 directed a conclusion that Penaloza was not disabled. Penaloza appealed the ALJ's denial of benefits to the district court, which affirmed the ALJ's decision. He then sought review in this court. We affirm. I. Allegations of Pain ___________________ Penaloza does not challenge the ALJ's determination that his knee condition and hypertension did not meet or equal any listing in the regulations. He claims, however, that the ALJ failed to consider his allegations of pain, asserting that he complained "constantly and persistently to the examining physicians of severe disabling pain." In his decision, the ALJ noted that Penaloza did have knee pain during the coverage period as a result of a fall that occurred on April 24, 1987. The ALJ found that Penaloza's pain responded to treatment, however, and that as of April 6, 1988, one week after Penaloza's coverage expired, Penaloza was experiencing no pain when his knees were palpated. The ALJ further characterized the pain that Penaloza had suffered to be of "moderate character" which was relieved by physical therapy and "mild analgesics of a non-narcotic character which did not cause any side effect[s]." Apparently on the basis of Penaloza's testimony at the hearings, the ALJ also found that Penaloza "may experience discomfort and mild to -3- moderate pain on an occasional basis and it [is] relieved by the use of non-narcotic analgesics." Penaloza's medical records fully support the ALJ's findings as to the nature of Penaloza's pain for the period before his coverage expired. The records document that Penaloza complained of pain to examining physicians and to his physical therapist a number of times after his fall. His complaints occurred even after the torn menisci (fibrocartilage) in both knees were removed arthroscopically. In all instances but one, however, the reports state merely that he reported "pain" or "discomfort" or that one or the other of his knees "hurt." Only once, in October 1987, within weeks of his surgery, did he report "intense pain," and that was to his physical therapist about his right knee. The pain appears to have resulted from the specific exercise he was performing during therapy that day. A subsequent report in November 1987 stated that he had full range of movement in both knees "without pain." The records contain no further report of pain in his right knee, although in December 1987 he reported to his physical therapist that the pain in his left knee had increased and in January 1988 he reported to the therapist that his left knee "continues to hurt." For the two-month period between the end of January and expiration of his coverage on March 31, 1988, however, there are no further reports of pain. On April 6, 1988, his physician reported that he had "no pain on palpation." -4- Most of Penaloza's testimony during the hearings in October 1989 and June 1990 described the pain he was experiencing at that time. Since he had reinjured his knees in a fall on March 30, 1989, before the hearings and a year after his coverage had expired, that testimony is of little relevance in determining his degree of pain during the coverage period. (The ALJ did consider that testimony, however, and determined, as the above summary of his findings indicates, that at the time of the hearings Penaloza was experiencing occasional mild to moderate pain which was relieved by analgesics.) Some of Penaloza's testimony did describe his pain during the coverage period after his first fall in April 1987. Penaloza explained "that a toothache would be more or less the same" as the pain he then experienced. When asked to describe the intensity of the pain, he stated that it was "a continuous pain, very strong." He further testified that he told his doctor that he "could no longer stand the pain," and that his doctor then recommended the menisectomy, or arthroscopic removal of menisci, which was performed in October 1987. As noted above, although Penaloza continued to report pain after the surgery, he last reported pain in January 1988, and, by April 1988, he experienced no pain in either knee. At the hearings, Penaloza also testified that he needed a cane to walk, and that he had received a cane -5- from the State Insurance Fund. The medical records show that, several weeks after he fell, he received a prescription for a wheelchair from the Fund, but not that a cane was ever prescribed or determined to be medically necessary (the medical reports note, however, that he came to appointments using a cane). At the hearings, Penaloza identified Motrin as one of the medications he was then taking and stated that it relieved his pain "all the time." At the first hearing, the ALJ also named two other medications -- Indocin and Medrol -- as being on a list that Penaloza had submitted to him. Motrin is a non-narcotic anti-inflammatory analgesic used to reduce swelling and pain. See Houts, Baselt & Cravey, ___ Courtroom Toxicology (1992) (under "Ibuprofen"). Indocin is ____________________ an anti-inflammatory analgesic, see The Sloane-Dorland ___ ____________________ Annotated Medical-Legal Dictionary 373 (1987), and Medrol is __________________________________ an anti-inflammatory, see Dorland's Illustrated Medical _____________________________________ Dictionary 993, 1028 (27th ed. 1988). Although Penaloza __________ testified that the pain "does not disappear completely," he confirmed that the medication made it possible for him to move around. At the first hearing he suggested that an unidentified medicine which he took at night to "relax" may have caused him some sleeplessness, but that otherwise he suffered no side effects from his medications. At the second hearing, he testified that some medications -- he may have -6- been referring to Medrol and Indocin which were the only medications named besides Motrin -- caused nausea, but no drowsiness. At the hearings, Penaloza did not identify the medications he took during his coverage period, but in an undated document entitled "Claimant's Statement When Request for Hearing is Filed", filled out presumably in 1989 when Penaloza requested a hearing, Penaloza identified the following medications as the prescription drugs he was taking at that time: Feldene, Tolectin, Naprosyn, Flexeril, Clinoril, and Minipress.1 With the exception of Minipress and Flexeril, all of those drugs are anti-inflammatory analgesics.2 See id. (under "Piroxicam", "Tolmetin", ___ ___ "Naproxen", and "Sulindac"). Unfortunately, the prescriptions given in the medical records for the period of coverage are often illegible, but the following are identifiable: Motrin, Feldene, Naprosyn, Indocin, Butazolidin, Darvocet, and Clinoril. Darvocet is a "mildly effective narcotic analgesic" used to relieve "mild to moderate pain." See Courtroom Toxicology, supra (under __________________________________ "Propoxyphene). Butazolidin is an anti-inflammatory ____________________ 1. Penaloza also identified "Asolid", but it appears not to be referenced in the Physicians Desk Reference or in Penaloza's medical records. 2. Minipress is a hypertension drug, see Courtroom _______________ Toxicology, supra (under the entry "Prazosin"), and Flexeril __________ _____ is a skeletal muscle relaxant used for relief of muscle spasms associated with acute, painful muscoskeletal conditions, see id. (under "Cyclobenzaprine"). _______ -7- analgesic. See Dorland's Illustrated Medical Dictionary, _______________________________________________ supra, at 248, 1278. _____ Thus, the medical record and Penaloza's testimony provide substantial evidence for the ALJ's conclusion that Penaloza's pain during the coverage period had been "moderate" and that it had been relieved by physical therapy and analgesics by the time his coverage expired. In support of his conclusion that Penaloza's pain had been relieved by analgesics of a "non-narcotic character," the ALJ specifically identified records from the coverage period which prescribed Butazolidin, Feldene, Motrin and Naprosyn. (He also referred to the Claimant's Statement which listed the medications taken in 1989 and an exhibit listing medications taken in 1990, including Indocin.) As stated above, Motrin is a non-narcotic analgesic, which provided Penaloza the greatest pain relief, at least as of the time the hearings were held. The other analgesic drugs the ALJ referred to all appear to have been non-narcotic as well. Although the ALJ did not mention Darvocet, which is a narcotic analgesic, that medication appears to have been prescribed only once when Penaloza began physical therapy. The ALJ also stated that the analgesics Penaloza took had no side effects. His conclusion is supported by the medical records, which contain no report of any side effects. Although Penaloza testified to some side effects during the -8- hearings, his testimony was not very probative. It concerned medications administered during 1989 and 1990 and did not identify which medications had caused the side effects. In addition, although some of those medications had been prescribed during the coverage period, the testimony on adverse side effects can fairly be said to have implicated only Indocin, which was named during the second hearing and was also prescribed once during the period of coverage. The ALJ's decision made no reference to the back injury which Penaloza claimed disabled him during the coverage period. However, after discussing evidence of Penaloza's knee injuries, pain and high blood pressure, the ALJ commented that the remaining evidence related only to the time after Penaloza's coverage had expired. Because the medical records for the coverage period contain no reports of back pain or evaluation of any back condition, we infer that the ALJ considered and rejected Penaloza's claim of disability due to back injury or pain. In the recitation of facts in his appellate brief, Penaloza describes a medical record from June 1988, which refers to "disabling painful residuals, specially of the back." But the ALJ did not err in not considering that record. Not only does the record describe a condition existing three months after Penaloza's coverage expired, but, more importantly, it appears to refer to a different patient altogether. The patient with the -9- painful back had also had his legs amputated, and thus could not have been Penaloza. A record from July 1988 further indicates that the records of a patient with a back condition had inadvertently been placed in Penaloza's file, and the June 1988 report is likely to have been that record. The medical records which do describe Penaloza's back condition all pertain to evaluations made months after expiration of the coverage period. At his first hearing, Penaloza stated that he had complained to his physical therapist of back pain. Although his testimony suggests that his complaints had occurred during therapy in 1987 during the coverage period, he also stated that the therapy took place at the "Medical Center". But he was not treated at the Medical Center until 1989, after expiration of the coverage period. Furthermore, the physical therapist's notes from 1987 reflect Penaloza's complaints of knee pain, but do not mention that he ever complained of back pain. Therefore, the record amply supports the conclusion that Penaloza did not suffer from a disabling back injury or pain during the coverage period. II. Appropriateness of Sedentary Work _________________________________ Penaloza argues that the ALJ's determination that he could perform sedentary work was wrong because it had not been shown that he could perform sedentary work "without serious aggravation to his present physical impairment." -10- Penaloza does not state whether he means his hypertension or his knee condition by the term "physical impairment." However, as long as the finding that Penaloza could perform sedentary work is consistent with the evidence about Penaloza's residual functional capacity ("RFC"), presumably sedentary work would not aggravate either condition. The record contains substantial support for the ALJ's conclusion that Penaloza could safely perform sedentary work as of March 31, 1988. Three uncontradicted RFC assessments by non-examining Social Security physicians are in the record, one evaluating Penaloza's hypertension, the other two his knee condition. Penaloza submitted no RFC assessment, although the ALJ gave him opportunity to do so. The report assessing Penaloza's RFC in view of his hypertension stated: "Diagnosis hypertension. Hospitalized in Jan '88 because of hypertensive crisis. Rt hemiplegia described but no detailed neurologic exam. No CT of the brain. More recent evaluation = no neurologic deficit. EKG = left axis deviation. Non specific ST-T changes. Chest x Ray = cardiomegaly. Heavy work activity should be precluded. RFC: medium work."3 The assessment also evaluated ____________________ 3. The RFC mistakenly states that Penaloza's hypertensive crisis occurred in January 1988, which would have been during the coverage period. The consulting physician's confusion undoubtedly arose because some of the handwritten records relating to Penaloza's hospitalization erroneously give January 5, 1988 as his hospitalization date. Other records, including some stamped by a dating device, which are -11- Penaloza's exertional capabilities by checking appropriate spaces on the RFC form. It indicated that, despite strength limitations imposed by his hypertension, Penaloza could lift and carry 50 pounds and frequently lift and carry 25 pounds, and that he could stand, walk and sit about six hours per eight-hour day and push or pull up to 50 pounds using either foot or hand controls. According to the assessment, Penaloza's hypertension did not affect his ability to climb, balance, stoop, kneel, crouch, crawl or engage in fine motor activities. On March 1, 1989, Dr. Irizarry Rivera described Penaloza's knee condition as follows: "Bilateral torn menisci. [B]oth knees repaired arthroscopically by 10/87. [T]reated [with] physic[al] therapy, had recurrent knee effusions which subsided by 4/88 & painless knees." He assessed Penaloza's strength limitations by checking the appropriate spaces, concluding that Penaloza retained the capacity to lift and carry up to 50 pounds, to frequently lift and carry up to 25 pounds, to sit, stand and walk about ____________________ interspersed with the erroneous handwritten records, make clear that the hypertensive crisis occurred on January 5, 1989, after the coverage period had expired. (The handwritten error appears to reflect the fact that a new year had just begun and the person writing down the date had not yet become accustomed to writing "1989".) The "more recent evaluation[s]", including the results of the EKG and chest X- ray, which were referred to in the RFC, actually predated Penaloza's hypertensive crisis and were within the coverage period. -12- six hours per eight-hour day, and to push and pull using foot controls up to "50/25 [pounds]." (By implication, Penaloza's ability to push and pull hand controls was unlimited.) Dr. Irizarry further indicated that Penaloza could balance and stoop frequently, although he could climb, kneel, crouch and crawl only occasionally, and that his fine motor skills (reaching, handling, fingering, feeling) were unimpaired. On June 14, 1989, Dr. Acevedo Defillo described Penaloza's knee condition in almost the same words as Dr. Irizarry. His assessment of Penaloza's physical capacity was essentially the same as Dr. Irizarry's except that he found that Penaloza could push and pull both hand and foot controls "[t]o 50 lbs max." Dr. Acevedo also found that Penaloza could balance and stoop frequently, and climb, kneel, crouch and crawl only occasionally. He found Penaloza's fine motor skills to be unimpaired. Thus, there was basic agreement between the two assessments as to what Penaloza's RFC was in light of his knee condition. The ALJ found Penaloza's residual functional capacity to be more restricted. He determined that Penaloza could perform only sedentary work. The difference in the physicians' evaluations and the ALJ's appears to be based on Penaloza's testimony describing the factors which precipitated pain in his legs, evidence not considered by the consulting physicians who reviewed only the medical records. -13- In his decision, the ALJ stated that "constant or frequent lower extremity movement would precipitate the pain, as also would . . . standing or walking for prolonged periods of time." Essentially, then, the ALJ's conclusion that Penaloza could perform sedentary work implies his determination that sedentary work would not aggravate Penaloza's knee condition. The ALJ could not himself have assessed the effect of sedentary work on Penaloza's hypertension since Penaloza did not testify as to any work-inhibiting symptoms arising from his hypertension. Presumably, however, since Penaloza had been evaluated by a physician as having the RFC to perform medium work despite his hypertension, it can be assumed that the performance of sedentary work would not exacerbate Penaloza's hypertension. Cf. 20 C.F.R. 404.1567(c) ("If ___ someone can do medium work, we determine that he or she can also do sedentary and light work."). In any event, the physicians' assessments provide support for the ALJ's determination that Penaloza could perform sedentary work. The regulations define sedentary work as work involving sitting, with occasional standing and walking, and lifting no more than 10 pounds at a time, with occasional lifting or carrying of articles like docket files, ledgers, and small tools. 20 C.F.R. 404.1567(a). Social Security Ruling 83-10 defines "occasionally" to mean "occurring from very little up to one-third of the time," so -14- that periods of standing or walking at the sedentary exertional level should comprise no more than about two hours per eight-hour work day and sitting would comprise the remaining six hours. The Ruling also states that most unskilled sedentary jobs "require good use of the hands and fingers for repetitive hand-finger actions." SSR 83-10, reprinted in [Rulings 1983-91] West's Social Security _____________ Reporting Service, at 29. The performance of sedentary work is well within the strength limitations indicated in all three RFC assessments, accordingly, and involves primarily hand and finger skills which Penaloza is capable of performing without limitation. Certain non-strength limitations were also described in the knee RFC assessments. Penaloza was stated to be able to climb, kneel, crouch and crawl only occasionally. But even those limitations appear to be consistent with the performance of sedentary work, in which the ability to sit predominates, with only occasional walking and standing. Furthermore, the Rulings indicate that the ability to climb, kneel, crouch and crawl would most likely be infrequent, but certainly no more than occasional activities in sedentary work. Ruling 83-14 states that "[r]elatively few jobs in the national economy require ascending or descending ladders and scaffolding" and that "to perform substantially all of the exertional requirements of -15- most sedentary . . . jobs, a person would not need to crouch . . . ." See id. at 44. Similarly, Ruling 85-15 indicates _______ that crawling is an "extremely rare factor" in sedentary work, that some limitation in climbing would not ordinarily have a "significant effect on the broad world of work," and that a limitation on kneeling "would be of little significance in the broad world of work." See id. at 93, 97. _______ Accordingly, we conclude that there is substantial evidence in the record to show that, as of the date Penaloza was last insured, the performance of sedentary work would not aggravate his hypertension or knee condition. III. Exclusive Reliance on the Grid ______________________________ The ALJ stated in his findings that Penaloza had no nonexertional limitations, and he therefore relied exclusively on Rule 201.25 of the Grid (20 C.F.R. Part 404, Subpart P, Appendix 2) to determine that Penaloza was not disabled. According to Penaloza, the ALJ erred since he had nonexertional limitations, consisting "mainly of pain" and his use of a cane which would make it impossible to carry work materials while walking. As a result, Penaloza avers, the ALJ could not rely exclusively on the Grid. We find no error in the ALJ's reliance on the Grid insofar as pain and Penaloza's use of a cane are concerned. Under the regulations, the determination whether pain is exertional or nonexertional depends upon the precise aspect -16- of physical functioning that is affected by the pain. See 20 ___ C.F.R. 404. 1569a(a)-(c). Pain is an exertional impairment when it affects strength requirements, such as sitting, standing and walking. See id. (a). It is nonexertional when _______ it affects requirements such as mental, manipulative or postural work function. See id. (c)(1). Penaloza's ________ testimony at the hearings attempted to establish that his knee and back condition and related pain precluded him from sitting, standing or walking. Consistent with Penaloza's own approach, the ALJ determined that Penaloza's knee condition affected his ability to stand and walk (but not to sit), and the ALJ found that Penaloza could not return to his former work as a security guard which required considerable standing and walking, but that he could perform sedentary work. Thus, the record fully justified the ALJ's treatment of Penaloza's pain as an exertional limitation. Nor was Penaloza's alleged use of a cane a nonexertional limitation since it affected his ability to carry work materials, and carrying is an exertional function. See id. (a). _______ Although Penaloza does not point to other nonexertional limitations, the RFC assessments by Drs. Irizarry and Acevedo indicated that Penaloza's ability to climb, kneel, crouch and crawl was limited by his knee condition. Climbing, kneeling, crouching and crawling are nonexertional postural functions, see id. (c)(1)(vi), which, _______ -17- normally, would preclude exclusive reliance on the Grid. Nevertheless, the ALJ's reliance on the Grid is supportable here. As Rulings 83-14 and 85-15 make clear, those functions are rarely required in sedentary work. Moreover, Penaloza is not completely prohibited from climbing, kneeling, crouching and crawling, but may in fact engage in those activities occasionally. Consequently, Penaloza's nonexertional limitations would not significantly erode his occupational base, and the ALJ was entitled to rely exclusively on the Grid. See Ortiz v. Secretary of Health and Human Services, _________ _______________________________________ 890 F.2d 520 (1st Cir. 1989) (the Grid may be relied on exclusively to yield a finding as to disability if a nonexertional impairment, even a significant one, has the effect only of reducing the occupational base marginally). Although the ALJ did not expressly determine, as he should have, that those nonexertional limitations did not significantly erode Penaloza's occupational base, that determination may be inferred from his analysis of the severity of Penaloza's knee condition. The ALJ determined that, at the time Penaloza's coverage expired, both of Penaloza's knees showed good muscular strength with no swelling, heat or pain, that when he had pain it responded to medication and therapy, that therapy had increased his range of motion, and that his condition would not keep him from pursuing recreational activities or light household -18- maintenance. However, the ALJ also concluded that Penaloza could not use his lower extremities for "constant repetitive movements," which clearly would encompass climbing, kneeling, crouching and crawling. In Frustaglia v. Secretary of Health __________ ___________________ and Human Services, 829 F.2d 192 (1st Cir. 1987), we ____________________ concluded in a similar situation that an ALJ could rely exclusively on the Grid. In Frustaglia, the nonexertional __________ limitation at issue was bending, the ALJ had found that the claimant could perform the full range of light and sedentary work although he could not engage in repeated bending, and Rulings indicated that bending was only an occasional requirement in light and sedentary work. We stated that "by definition [repeated bending] is a more strenuous mode than occasional activity" and that "[i]t is fairly obvious that such a restriction would have very little effect on the ability to perform the full range of work at either the light or sedentary level." Id. at 195. Similarly, here the ALJ ___ found that Penaloza could not engage in repetitive leg movements, which would include climbing, crouching, crawling and kneeling, and the Rulings make it "fairly obvious" that a limitation permitting the occasional performance of those activities would have little effect on Penaloza's ability to perform substantially all requirements of sedentary work. Accordingly, although it would have been preferable for the ALJ to have expressly found that Penaloza's postural -19- limitations did not significantly erode his occupational base, and to have supported his finding by reference to the record or Rulings, under the circumstances his failure to do so does not require remand. IV. Remaining Claims ________________ Penaloza also appears to claim that the ALJ failed to take into account the combined effects of his mental and physical conditions. Penaloza's first visit to a mental health clinic was at his attorney's suggestion some six months after the coverage period had expired. Thus, there was substantial evidence to support the ALJ's determination that Penaloza was not disabled by any nervous or mental condition, and so there was no need to consider how such a condition, when combined with Penaloza's physical impairments, affected his capacity for substantial gainful employment. Moreover, the text of the ALJ's decision indicates that he considered the combined effects of Penaloza's physical conditions and pain. He drew the conclusions he did about Penaloza's physical capabilities after "considering the claimant's musculoskeletal and hypertensive condition plus the above described discomfort and mild to moderate pain." Penaloza also alleges that the ALJ cited only evidence favorable to the Secretary, disregarded the medical evidence of his disability, and based the disability -20- determination on his own medical opinion. He provides no detail as to what evidence the ALJ allegedly disregarded, and does not describe in what respect the ALJ ignored the opinions of examining or consulting physicians, or otherwise based his disability determination on his own medical opinion. We have reviewed the ALJ's decision and the record and find no error of the kind Penaloza has alleged. The ALJ's determination that Penaloza could perform sedentary work ascribes a functional capacity to Penaloza which is well within the limitations described in the uncontradicted RFC assessments of record. The decision of the district court is affirmed. ________ -21-