**Herbert HATCHER, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security, Defendant.**

**No. 99–4096–RDR.**

United States District Court,
D. Kansas.

March 1, 2001.

Joseph A. Desch, Topeka, KS, for Plaintiff.

Jackie A. Rapstine, Office of U.S. Atty., Topeka, KS, for Defendant.

## MEMORANDUM AND ORDER

ROGERS, Senior District Judge.

This is an appeal from the denial of plaintiff's application for supplemental security income benefits. Plaintiff asserts that he has been disabled from substantial gainful employment since July 19, 1996. However, he filed the application leading to this appeal in 1995. Later he amended his alleged disability onset date to the above-mentioned date. Plaintiff's hearing before the Administrative Law Judge (ALJ) occurred on November 14, 1997.

Plaintiff was born in 1950. At the time of the hearing before the ALJ, plaintiff weighed 315 pounds. He is approximately 5′9″ tall. He has an I.Q. of 73. He does not have a high school diploma or a G.E.D.[1] He struggles to write and has minimal reading skills. It is undisputed that plaintiff has suffered from the following impairments: a back injury; degenerative disc disease at L3–4 and L4–5; epidural lipomatosis; obesity; borderline intellectual functioning; and an adjustment disorder.

The medical records submitted to the ALJ revealed the following. Dr. Frye examined plaintiff on July 29, 1996 after plaintiff injured his back unloading cabinets. Dr. Frye found:

On examination this is a large framed individual who is walking, leaning slightly forward. He stated he is having no pain walking. Initially, although he is walking slowly, can increase his rate without any difficulty.... There is [a] mild amount of tenderness across the lower lumbar spine from L3 to L5/S1 and both paraspinous musculature in the area. SI joints are nontender. Sacral notches are nontender. Thoracic spine is nontender. He has good movement on range of motion with pain at end range of motion that is mild. He had good segmental movement with forward flexion, extension and side flexion in both directions. Straight leg raise is negative sitting, positive laying at 50 degrees with low back pain.

X-rays are essentially normal.

ASSESSMENT: This appears to be a mild low back strain. The cause by history may have been work-related but it is not clear-cut....

PLAN: 1. 20 lb. weight limit, no repetitive bending or lifting. 2. Gel Pak for local icing and then can switch to heat. 3. Instructional booklet for low back care and range of motion stretching. 4. Naprosyn 500 mg ... Norflex 100 mg ...

It is noted that the patient states that he will need to get a second opinion and talk to his attorney as he is quite wor-

---

1. Plaintiff's educational progress is somewhat uncertain. He has stated before that he completed the twelfth grade attending special education classes. (Tr. 147). He has also stated that he had a sixth-grade education (Tr. 169) and a third-grade education. (Tr. 154).

ried about his low back, although he has not expressed any sense of more than mild discomfort in the office. He will state he will go to his doctor, although notes he does not have a regular physician. Will have to ask his attorney, although he notes he does not have an attorney.

(Tr. 132–33). A recheck by Dr. Frye two days later indicated no significant change in plaintiff's condition. (Tr. 135).

On August 23, 1996, Dr. Sharon McKinney wrote the following after examining plaintiff:

> He is not able to do any household chores as it hurts so much. He is unable to drive as it hurts too much. He can't do any yard work. He states he watches t.v. a lot. He does use heat and exercise occasionally at home. He takes muscle relaxers twice a day and Darvon. He notes increased pain with walking quickly or going up and down stairs. When he does stairs the pain will go down into his legs.
>
> PHYSICAL EXAM: Mr Hatcher is a little overweight.
>
> GAIT: He walks with in a bit of hip flexion. He can walk on his heels, toes and tandem barely adequately.
>
> LOW BACK: Range of motion is mildly limited in rotation and lateral bending and flexion. He has pain in the low back with back hyperextension. Straight leg raising is positive at 75 degrees bilaterally. Strength is ⅘ except for abdominals which are 4 to 4⊖/5.
>
> . . . . .
>
> IMPRESSION: Myoligamentous strain low back and right posterior hip girdle muscles. It is possible he also has a disc or degenerative changes but I doubt if they are the major contributor to his problem.
>
> I spent some time talking to him about this kind of a lesion, showing him the anatomy involved in the low back and pelvis and how the nerves and muscles work, explained why he is having the pain and what kinds of things he can do to help. He should continue with the therapy and I showed him some exercises he could do and told him things he should not do. I recommended he continue with the use of heat and suggested that he lose a little weight as he would benefit from that. This injury is caused by his work. He should be able to return to work in the future.

(Tr. 136–37).

Dr. Carroll Ohlde made a psychological and intellectual assessment of plaintiff on October 21, 1996. She concluded:

> In a work setting he has the capability to understand and perform simple unskilled tasks in an average amount of time, to keep a work schedule with average performance demands for such tasks, to sustain adequate concentration over a workday in at least routine activities, and to communicate adequately with co-workers and supervisors as he has in the past in his construction work. Based on his psychological and intellectual functioning, he is able to work.
>
> . . . . .
>
> He related he can care for his personal hygiene and personal needs, do some household tasks, prepare some simple meals, shop for some needs, and make/carry out some independent plans within reported limitations caused by his back injury. He demonstrated adequate ability to understand and follow instructions during the interview and assessment but struggled to read, write, understand sentences and follow instructions.... Due to his poor mathematical abilities, he needs help with managing his own funds.

(Tr. 150–51). These findings were made in addition to Dr. Ohlde's diagnosis that

plaintiff had an adjustment disorder with depressed mood and borderline intellectual functioning. (Tr. 150).

An examination by Dr. Thompson on October 26, 1996 produced the following results:

The patient has a history of low back pain dating back to July of 1996.... He describes restless sleep and is up several times a night. He states that he has to lay on the floor to sleep. He can sit for twenty minutes, stand for twenty minutes, or walk fifteen minutes at a time. He can occasionally lift twenty pounds. There is some morning stiffness, worsening in cold, wet weather. The patient brings no medications to the evaluation today for this condition.

.     .     .     .     .

There is pain in the lumbar spine. Straight leg raising is 90 degrees bilaterally, with paraspinous muscle spasm.

.     .     .     .     .

An assistive device is not used.

The patient had mild difficulty getting on and off the examining table.

There was moderate difficulty with heel and toe walking.

There was moderate difficulty squatting and arising from the sitting position.

There was moderate difficulty hopping.

CONCLUSIONS

1. Lumbar arthralgias with possible radiculopathy.

The patient has a history of back pain. Today he walks with small-stepped, widebased gait favoring the left side. He reports a history of injury as per old chart. Today there is restricted ventral plane range of motion and evidence of paraspinous muscle spasm. I find diminished sensation in the left medial calf in the L4 distribution without reflex or motor changes. He had mild to moderate difficulty with orthopedic maneuvers. A back brace is used. X-ray of the lumbar spine is enclosed showing minimal narrowing of the L3–4 disc space.

(Tr. 154–56).

X-rays of plaintiff's back on the same day showed:

Vertebral height and alignment are satisfactory. There is minimal narrowing of the L3–4 disc space, without significant secondary spurring or eburnation along opposing end plates. Remaining disc spaces are well maintained. I see no abnormalities affecting the posterior elements or sacroiliac joints.

(Tr. 157).

Dr. Ebeling examined plaintiff in February 1997. He believed the degenerative changes in plaintiff's spine pre-existed his back injury and that the epidural lipomatosis was not associated with plaintiff's complaints. (Tr. 172–73). Dr. Ebeling recommended in August 1997 that plaintiff "continue with conservative measures which would include mild narcotics, anti-inflammatory medication, and possibly physical therapy from time to time for exacerbations." (Tr. 172).

Dr. Zimmerman evaluated plaintiff in July 1997. He related plaintiff's complaints as follows:

At this time, Mr. Hatcher continues to have pain and discomfort affecting his lumbosacral spine. He noted that he has difficulty in being seated. He did not, however, offer a time frame as to the length of time he could be seated before he would wish to change positions or move about. He, on the other hand, noted if he sits for extended periods of time that he has difficulty in standing up erect and has increased pain at the lumbar level if seated for extended periods of time. He estimated that he could stand for less than 1 hour before pain and discomfort at the lumbar level would cause him to wish to get off his feet. He

noted that he could walk approximately 2 blocks. He stated by then that he would have pain at the lumbar level. He reported no increased pain or discomfort with coughing or sneezing. He denied bowel or bladder symptomatology. He notes that he has a difficult time sleeping in that he has marked difficulty in achieving a comfortable position in which to rest. He notes that often times he lies on the floor as he does get relief if he lies on a hard surface. He reports occasional numbness and tingling affecting the posterior distal thighs and proximal calves.

(Tr. 169).

Upon examination, Dr. Zimmerman found:

Gait and station were normal.

In directed examination of the lumbosacral spine, there was intraspinous tenderness from L1–S1. There was no spasm of the lumbar paraspinous musculature on either the right or left sides. There was no tenderness on palpation of the lumbar paraspinous musculature on either the right or left sides. There was no sciatic notch tenderness on palpation on either the right or left sides. There was no saddle numbness in use of a Wartenburg wheel on either the right or left sides. There was no pain on palpation of the trochanteric bursae on either the right or left sides. The straight leg raising test on the right and left was 70 degrees. In doing this testing on both sides, he had pain at the mid-lumbar spine level. The figure 4 maneuver on the right and left sides with full excursions in abduction and adduction caused pain affecting the mid-lumbar spine in both phases of testing.

.        .        .        .        .

At the lumbar level measured with an inclinometer, forward flexion was 80 degrees, extension 30 degrees, rotation to the right and left 45 degrees, and flexion

to the right and left 30 degrees. There was 1⮒ edema pretibially bilaterally. Because of this finding, I did take his blood pressure. His blood pressure was 130/90. He was able to heel, toe, and tandem walk satisfactorily. He was able to do a deep knee bend; however, in doing so, he held his lumbosacral spine in a rigid posture. In doing a bounce test, he did not have pain or discomfort at the lumbar level.

In an effort to more completely assess Mr. Hatcher, an x-ray of the lumbosacral spine, PA and lateral, was performed in my office under my supervision and direction.

The PA view of the lumbosacral spine demonstrated normal vertebral alignment. There was no osteoarthritic change. The lateral view demonstrated disc space narrowing at L4–L5 and L5–S1. There was osteoarthritic change at L3–L4. There was no spondylolisthesis.

(Tr. 170).

Dr. Zimmerman concluded:

In summary, Mr. Hatcher sustained an injury affecting his lumbosacral spine in his work functions as has been narrated. His injuries occurred in moving heavy furniture on a dolly. In doing so, he developed severe pain and discomfort affecting the lumbar paraspinous musculature. He was seen by Dr. Frye who treated him on a conservative basis. Likewise, Dr. Sharon McKinney recommended conservative care. He was seen by Dr. Ebeling who did report that an MRI study showed narrowing of the thecal sac which may be consistent with his reported sensory abnormalities affecting his lower extremities which are those which could be construed to be best characterized as findings consistent with a diagnosis of spinal stenosis.

I would state, secondary to ongoing pain and discomfort at the lumbar level with

degenerative change permanently aggravated by his injury sustained on July 19, 1996 when working for Ferrell Construction, that Mr. Hatcher has sustained permanent partial impairment of the body as a whole which should be rated at 7%.

This rating is based upon the 4th Edition AMA Guides to the Evaluation of Permanent Impairment.

I believe Mr. Hatcher's condition is stable. I do not believe further diagnostic or therapeutic intervention is warranted. Mr. Hatcher is capable of lifting 20 pounds on an occasional basis, 10 pounds on a frequent basis. He should avoid frequent flexing of the lumbosacral spine and, hence, should avoid frequent bending, stooping, squatting, crawling, and kneeling activities as such activities, repetitively carried out or carried out over extended periods of time, would be likely to increase pain and discomfort affecting the lumbar paraspinous musculature.

Pain and discomfort can be treated with aspirin and/or Tylenol if he chooses to take medication. Such treatment can be self directed.

Pain and discomfort also can be treated with heat in the form of hot tub baths, hot showers, and/or heating pad locally applied. Such treatment can be self directed.

I believe Mr. Hatcher's condition is stable. I believe his prognosis is acceptable; particularly if the above mentioned restrictions and recommendations are assiduously adhered to.

(Tr. 170–71).

Dr. George Chance, a psychologist, provided expert testimony regarding plaintiff's mental health status. Dr. Chance stated:

The record holds very little in the way of psychological information. But there is a one-time evaluation that lists a diagnosis of adjustment disorder with depressed mood. That's his only diagnosis. I think it might be important to note … that adjustment disorder with depressed mood has the slightest of symptoms in terms of the affective disorders. It's the least diagnosable mental condition with symptoms and it's very amenable to treatment frequently requiring no treatment, usually no medication. And is generally short in nature, it is not debilitating.

.     .     .     .     .

The information in the record shows that the claimant has borderline intellectual functioning with an IQ of 73 points. It wouldn't be classified as … a learning disability. . . . It is one of the scores that is encompassed in the area called borderline intellectual functioning. It lies between normal intellect and mild mental retardation. It also is not disabling.

.     .     .     .     .

Given the right level of task, his intellect would not preclude him from work. His physical condition I'm not prepared to speak to, but his intellectual condition there are many people that work both in competitive employment and in supplemental employment at his … level.

(Tr. 45 & 48).

A vocational expert testified in this matter. The ALJ asked him to assume that plaintiff had degenerative disc changes; that he could lift 20 pounds occasionally and 10 pounds frequently; that he should avoid frequent flexing of his spine and should avoid frequent bending, stooping, squatting, crawling and kneeling; and that he has the educational attainment of special education at either a sixth grade or tenth grade level. The expert determined that plaintiff under these limitations could perform light work as a hand packager, food assembler, laundry folder, and cafete-

ria service worker or housekeeper/cleaner. (Tr. 50–51). The Commissioner has since acknowledged that the occupation of food assembler would not be within plaintiff's residual functional capacity.

When the ALJ reviewed this case, he concluded that plaintiff had a severe impairment which prevented him from performing construction work—plaintiff's past relevant work. He determined that plaintiff's physical and mental condition did not meet the listings for impairments which qualify a person to receive benefits. Ultimately, he denied plaintiff's application for benefits upon concluding that plaintiff retained the residual functional capacity to perform light work and that plaintiff's mental capacity did not exclude him from performing light work jobs which existed in substantial numbers in the economy. (Tr. 18). In reaching these conclusions, the ALJ discounted the credibility of some of plaintiff's complaints of pain. The testimony of the vocational expert was also relied upon by the ALJ in deciding that plaintiff did not qualify for benefits. (Tr. 18).

We review the decision to deny benefits in this case "to determine whether it is supported by substantial legal evidence and whether correct legal standards were applied." *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir.2000). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Soliz v. Chater*, 82 F.3d 373, 375 (10th Cir.1996).

Plaintiff contends that the ALJ's decision as adopted by the Commissioner should be reversed because the ALJ did not carefully consider all of the evidence. Plaintiff alleges initially that the ALJ failed to consider the medical reports of Dr. Zimmerman, Dr. Ebeling and Dr. Thompson. Literally, this is incorrect because all of these reports are discussed in the ALJ's decision. (Tr. 13–14). More specifically, plaintiff's contention appears to be that the ALJ failed to credit plaintiff's complaints of pain in light of the support shown for those complaints in the medical reports.

■ The ALJ's credibility findings require the court's deference and must not be upset if they are supported by substantial evidence. *Winfrey v. Chater*, 92 F.3d 1017, 1020 (10th Cir.1996). In this instance, we believe the credibility findings are supported by substantial evidence. The ALJ considered the plaintiff's complaints of pain in light of the factors suggested in *Luna v. Bowen*, 834 F.2d 161 (10th Cir.1987). He found that while plaintiff's complaints had an objective basis, the alleged extent of his pain was not supported with objective medical evidence and was contradicted by other evidence. None of the doctors mentioned in plaintiff's brief indicated that plaintiff's functional capacity was less than what the ALJ concluded. In addition, plaintiff sometimes reported that he used no medication and once stated that he used four to six Tylenol a day. This does not suggest a disabling level of pain. Plaintiff was able to care for himself. He had a spotty employment record, but was able to engage in part-time work at the time of the hearing before the ALJ. The ALJ also discounted plaintiff's testimony that he needed to lie down periodically during the day, because plaintiff did not report this to doctors who examined him. He also noted that plaintiff did not use an assistive device and did not take full advantage of other steps, e.g., physical therapy and weight loss, available to him to promote his well-being and functional capacity.

In sum, the court believes the ALJ thoroughly analyzed plaintiff's complaints of pain in light of the medical record and relevant legal standards. We find no error in his conclusions.

Plaintiff also argues for reversal on the grounds that the ALJ incorrectly determined that plaintiff had a " 'high school' education obtained through special education." (Tr. 18). The Commissioner agrees that plaintiff may not have a high school education, but contends that plaintiff is not disabled in any event.

■ The Commissioner's response is persuasive to the court. The court believes there is substantial evidence for the conclusion that plaintiff has at least a "marginal education." "Marginal education" is defined as:

ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.

20 C.F.R. § 416.964(b)(2). If plaintiff has a marginal education, the grid regulations command a finding of not disabled assuming plaintiff has a residual functional capacity to perform light or sedentary labor. 20 C.F.R. Part 404, Subpart P, Appendix 2, §§ 201.18 & 202.17. Even if plaintiff is considered illiterate, but capable of performing light work, the grid regulations command a finding of not disabled. 20 C.F.R. Part 404, Subpart P, Appendix 2 § 202.16. In addition, a vocational expert considered plaintiff's functional capacity as well as his educational and intellectual attainment and determined that plaintiff was not disabled from substantial gainful employment. Therefore, any mistake made regarding plaintiff's level of education does not alter the substantial evidence in support of the ALJ's conclusion.[2]

Plaintiff contends that his inability to concentrate or to remember instructions precludes him from doing the jobs suggested by the vocational expert. The court rejects this contention because substantial evidence indicates that plaintiff does have the mental capacity to concentrate and remember instructions. Plaintiff's work history and the statements of Dr. Ohlde support this conclusion.

■ Next, plaintiff asserts that the ALJ incorrectly concluded that plaintiff could perform light work when examining physicians stated that plaintiff could not do frequent bending. We reject this argument. Occasional, not frequent, bending is necessary for a wide range of light work. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 525 (1st Cir.1989); *Frustaglia v. Secretary of Health & Human Services*, 829 F.2d 192, 195 (1st Cir. 1987). Furthermore, a vocational expert who was aware of plaintiff's bending limitation and was asked to assume that plaintiff could not frequently bend, testified that there were jobs available in the national and local economies which plaintiff could perform.

Finally, plaintiff contends that the ALJ failed to consider the combination of exertional and non-exertional impairments which are presented in plaintiff's case. Specifically, plaintiff contends that the ALJ ignored plaintiff's adjustment disorder. The court disagrees. The ALJ discussed plaintiff's adjustment disorder at pages 6 and 7 of his decision. (Tr. 15–16). His conclusion that the adjustment disorder does not constitute a significant impairment is supported by the testimony of Dr. Chance and Dr. Ohlde.

In conclusion, the court has considered the record carefully and finds that the

---

**2.** This also answers plaintiff's attack upon finding number 9 of the ALJ, which references § 202.20 of the grid regulations. (Tr. 18). Even if § 202.20 is not the appropriate level to consider given plaintiff's educational and intellectual status, other grid regulations which are conditioned upon a lesser educational level dictate of finding of not disabled in this case.

decision to deny benefits should be affirmed.

**IT IS SO ORDERED.**