Brian K. CONNER, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner, Social Security Administration, Defendant.

Civil Action No. 04–12471–MBB.

United States District Court,
D. Massachusetts.

July 17, 2006.

Patrick K.B. Tracy, Patrick K.B. Tracy, Esq., Boston, MA, for Plaintiff.

Jeffrey Mark Cohen, United States Attorney's Office, Boston, MA, for Defendant.

**MEMORANDUM AND ORDER RE: PLAINTIFF'S MOTION TO REVERSE OR REMAND THE DECISION OF THE COMMISSIONER (DOCKET ENTRY # 11); DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE COMMISSIONER (DOCKET ENTRY # 15); PLAINTIFF'S MOTION FOR RECONSIDERATION FROM THE DENIAL OF HIS MOTION TO SUPPLEMENT THE RECORD WITH NEW EVIDENCE (DOCKET ENTRY # 25)**

BOWLER, United States Magistrate Judge.

Pending before this court are cross motions by the parties, plaintiff Brian K. Conner [1] ("Conner") and defendant Jo Anne B. Barnhart, Commissioner of the Social Security Administration ("Commissioner"). Conner filed a motion to reverse the Commissioner's decision or, in the alternative, to remand the case under 42 U.S.C.

§ 405(g). (Docket Entry # 11). The Commissioner moves for an order affirming the denial of benefits. (Docket Entry # 15). Also pending before this court is Conner's motion for reconsideration from the denial of his motion to supplement the record with new evidence. (Docket Entry # 25). On June 27, 2006, this court held a hearing on the motions (Docket Entry # # 11, 15, 24 & 25) and took the matter under advisement.

### PROCEDURAL HISTORY

On January 3, 2003, Conner filed an application for disability insurance benefits ("DIB") with the Social Security Administration ("SSA"). (Tr. 83–85). Conner claimed that he had been unable to work since January 7, 2000, because of a "back condition." (Tr. 90–91). The SSA denied Conner's DIB application on March 17, 2003 (Tr. 63–66), and on May 22, 2003, the SSA denied Conner's DIB application on reconsideration. (Tr. 68–71). On July 15, 2003, Conner filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 72–73). The ALJ held a hearing on April 26, 2004, at which Conner testified. (Tr. 27). After the ALJ issued an unfavorable decision to Conner on August 21, 2004 (Tr. 16–26), Conner filed a request for the SSA Appeals Council ("Appeals Council") to review the ALJ's decision. (Tr. 13–15). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review on September 24, 2004. (Tr. 10–12). Conner then petitioned this court for a reversal or remand pursuant to 42 U.S.C. § 405(g).

### CONTENT OF THE RECORD

Prior to summarizing the factual record, it is necessary to resolve whether

---

**1.** Both parties refer to plaintiff as "Brian K. Connor" in their respective motions but plaintiff spells his name as "Brian K. Conner." (Tr. 105).

the record should include the new evidence introduced by Conner. If new evidence is material and there is good cause for the failure to incorporate such evidence into the record in a prior proceeding, this court may remand the case for further proceedings and order that the evidence be added to the record. *Mills v. Apfel*, 244 F.3d 1, 5 (1st Cir.2001); 42 U.S.C. § 405(g). In the present case Conner moved to supplement the record with "Exhibit A," an amended version of a report by Scott Henderson, M.D. ("Dr. Henderson"), an internist. "Exhibit A" is dated April 15, 2004. It is unclear if Conner received this amended report before the ALJ hearing on April 26, 2004, but Conner has failed to provide any explanation for why he failed to introduce this evidence to the ALJ either prior to the hearing or prior to the ALJ's decision on August 21, 2004. Accordingly, Conner has not shown good cause for failing to introduce the evidence and this court will not order that it be added to the record.

■ Even if Conner had shown good cause for his failure to introduce the evidence, this court does not consider the information in "Exhibit A" to be material. New evidence is material if the ALJ's decision "might reasonably have been different" were it considered. *Evangelista v. Secretary of Health and Human Services*, 826 F.2d 136, 140 (1st Cir.1987) (quoting *Falu v. Secretary of Health and Human Services*, 703 F.2d 24, 27 (1st Cir.1983)). Here, the new evidence amends a report that Dr. Henderson initially made on March 25, 2004. As discussed *infra*, Conner's condition on March 25, 2004, was irrelevant because that time period follows his date last insured (DLI), September 30, 2001. Since the ALJ determined that Conner was not disabled on or before his

DLI (Tr. 22), adding new evidence to the record regarding Connor's condition on March 25, 2004, would not create a situation where the ALJ's decision might reasonably have been different. Hence, the new evidence is not material.

### FACTUAL HISTORY

Conner was born on April 9, 1959 (Tr. 83), he completed high school in 1977 and he did not attend college or a vocational school. (Tr. 96). At the time of the ALJ hearing he was 45 years old (Tr. 83), married and had three children. (Tr. 37). Conner's past relevant work experience was as a truck and van driver, a machine operator and a shoe salesman. (Tr. 105). Conner worked the longest period of time as a machine operator, and on a normal day he would stand and reach for eight hours, stoop and crouch for one hour and lift and carry objects weighing up to 50 pounds. (Tr. 91–92).

Conner injured his back while working as a truck driver on January 7, 2000. (Tr. 32–33). Dr. Henderson saw Conner on January 24, 2000 (Tr. 263), and referred him for a lumbar MRI [2] on February 7, 2000. (Tr. 183–184). The MRI revealed a left sided disc herniation at L4–5 which narrowed the canal and impinged and deformed the thecal sac. (Tr. 184). Conner's MRI also revealed moderate spondylosis, prominent degenerative changes at the facets in the lower lumbar spine and a generalized disc protrusion at L5–S1 which narrowed the canal but did not impinge on the thecal sac or the nerve roots. *Id.*

Dr. Henderson referred Conner to Aldo Beretta, M.D. ("Dr. Beretta"), an orthopedic surgeon, who examined Conner on February 17, 2000. (Tr. 139–142). Con-

---

**2.** "MRI" is an abbreviation for "magnetic resonance imaging." *Stedman's Medical Dictionary*, p. 1135 (27th ed.2000).

ner was able to heel and toe walk without any difficulty but he reported having had six weeks of back pain. (Tr. 139). Dr. Beretta diagnosed Conner with a herniated disc and degenerative disc disease. *Id.* During a follow up visit on March 14, 2000, straight leg raise testing was negative bilaterally and Conner reported left leg and right buttock pain. (Tr. 138). Dr. Beretta diagnosed Conner with a left sided L4–5 herniated nucleus pulposus. *Id.* Dr. Beretta recorded the same diagnosis after Conner's visit on April 6, 2000, during which the "patient ambulate[d] with a slightly antalgic gait." (Tr. 137). Conner's lumbar spine flexion and extension were limited because of pain during this visit, straight leg raise testing was positive, there were some sensory deficits in Conner's "lower extremities along the dorsal aspect of the foot" and he had difficulty walking on his heels. *Id.*

On June 20, 2000, Harry VonErtfelda, M.D. ("Dr. VonErtfelda"), an orthopedic surgeon, saw Conner for an independent medical evaluation ("IME"). (Tr. 293–298). Dr. VonErtfelda characterized Conner's degenerative changes at L4–5 and L5–S1 as "very minimal." (Tr. 295). Dr. VonErtfelda found no evidence of scoliosis or muscle spasm, seated straight leg raising was negative bilaterally and supine straight leg raising was positive to 45 degrees. (Tr. 296–297). Dr. VonErtfelda also diagnosed Conner with an L4–5 herniated nucleus pulposus and concluded that he was capable of light work but should avoid lifting over 10 to 15 pounds. (Tr. 298).

On June 30, 2000, Dr. Beretta reviewed Conner's MRI and noted "significant nerve root impingement." (Tr. 136). He therefore recommended disc excision. *Id.*

On August 7, 2000, Conner saw Matthew Frank Philips, M.D. ("Dr. Philips"), a neurosurgeon, and reported intermittent pain with extreme exacerbations when lifting and during periods of prolonged sitting. (Tr. 131). Dr. Philips described Conner's back as straight with decreased range of motion, especially with respect to flexion and extension. *Id.* Dr. Philips thought Conner had evidence of lumbar insufficiency from his "markedly degenerative disc spaces," but he did not feel Conner had "any significant symptoms or signs of nerve root compression." (Tr. 132).

On August 16, 2000, Dr. Beretta wrote in correspondence that Conner had sustained a herniated disc with nerve root impingement. (Tr. 133). Dr. Beretta described Conner as "totally disabled" and mentioned that he was scheduled for surgical intervention for disc excision. *Id.* Between May 1, 2000 and August 25, 2000, Conner received acupuncture treatments from Dionysios Skaliotis, a licensed acupuncturist, who later described Conner's prognosis as "poor at best." (Tr. 187–200). Between September 15, 2000 and February 9, 2001, Conner underwent treatment at the Pain Care Center which included an epidural injection. (Tr. 143–148).

Amin Sabra, M.D. ("Dr. Sabra"), a neurologist, conducted a neurological evaluation of Conner on December 6, 2000. (Tr. 158–159 & 221–222). Conner reported continuing pain in his lower back and anterior thighs with difficulty bending and an inability to lift heavy objects. *Id.* Straight leg raising was positive at 50 degrees bilaterally and Dr. Sabra opined that it was possible that Conner's disc herniation was irritating his nerve roots. (Tr. 159 & 222). Dr. Sabra suggested that Conner undergo an EMG [3] and another MRI of his lumbar

---

**3.** "EMG" is an abbreviation for "electromyogram." *Stedman's Medical Dictionary,* p. 582 (27th ed.2000).

spine to determine if there was evidence of compression of the nerve roots. *Id.*

On January 22, 2001, Conner's second lumbar spine MRI revealed a degenerative change of his facet joints and disc herniations that were consistent with a focal annular tear. (Tr. 150–151). Also, there was no evidence of significant lumbar radiculopathy from Conner's EMG. (Tr. 154). As a result, Dr. Sabra told Conner's wife during a telephone conversation that Conner's bulging discs were not in a position to compress the nerve roots and, thus, he was not a surgical candidate. (Tr. 157).

On January 31, 2003, Conner had another lumbar spine MRI which revealed an L5–S1 disc protrusion and an L4–L5 disc protrusion that was slightly smaller than it had been in his prior MRI. (Tr. 182). Conner also underwent a thoracic MRI which revealed "no intrinsic spinal cord abnormality." (Tr. 179).

On March 12, 2003, Virginia E. Byrnes, M.D. ("Dr. Byrnes"), an internist, conducted a residual functional capacity ("RFC") assessment of Conner. (Tr. 201–208). Dr. Byrnes concluded that Conner could lift and carry ten pounds occasionally and less than ten pounds frequently. (Tr. 202). Dr. Byrnes noted that vibration or repeated climbing could aggravate his lower back pain and that his impairments would only allow Conner to stand two hours in an eight hour workday. (Tr. 205 & 208). On May 20, 2003, Marcia Lipski, M.D. ("Dr. Lipski"), a family practitioner, also conducted an RFC assessment of Conner. (Tr. 209–216). Dr. Lipski reached the same conclusions as Dr. Byrnes regarding Conner's exertional limitations. (Tr. 210).

Dr. Henderson completed a medical source statement of Conner's abilities to

do work related activities on March 25, 2004. (Tr. 269–272).[4] Like Dr. Byrnes and Dr. Lipski, Dr. Henderson concluded that Conner could lift and carry ten pounds occasionally and less than ten pounds frequently. (Tr. 269). Dr. Henderson also concluded that Conner could stand and/or walk about six hours in an eight hour workday but that he should never crouch or crawl. (Tr. 269–270).

On April 11, 2004, Conner underwent a cervical MRI which revealed cervical spondylosis, moderate to moderately severe right sided C5–C6 and C6–C7 foraminal narrowing and right sided disc protrusions at C5–C6 and C6–C7. (Tr. 273–274). Finally, on April 13, 2004, Barbara Braun Weiner, LICSW, concluded that Conner had moderate major depression and an anxiety disorder. (Tr. 275–276).

## DISCUSSION

### A. *Jurisdiction and Standard of Review*

 When the Appeals Council denies review, the ALJ's decision becomes the Secretary's final decision. 20 C.F.R. §§ 404.981 & 416.1481. This court has the power to affirm, modify or reverse the ALJ's decision, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The ALJ's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales,* 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Manso–Pizarro v. Secretary of Health and Human Services,* 76 F.3d 15, 16 (1st Cir.1996). This court determines "whether the final decision is supported by substantial evidence and whether the correct legal standard was used." *Seavey v. Barnhart,* 276 F.3d 1, 9 (1st Cir.2001). Substantial evidence is

---

4. The ALJ used this version of Dr. Henderson's report, not the one that includes the information in "Exhibit A."

more than a scintilla of evidence that a reasonable person could find sufficient to support the result. *Musto v. Halter,* 135 F.Supp.2d 220, 225 (D.Mass.2001) (citing *Rodriguez v. Secretary Of Health and Human Services,* 647 F.2d 218, 222 (1st Cir. 1981)). "Even if the record could arguably support a different result," this court must affirm the ALJ's conclusion if supported by substantial evidence. *Rodriguez Pagan v. Secretary of Health and Human Services,* 819 F.2d 1, 3 (1st Cir.1987).

**B. *Disability Determination***

The ultimate question is whether Conner is disabled within the meaning of 42 U.S.C. § 423(d). That provision defines disability as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The impairment must be of such severity that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial work which exists in the national economy." *Deblois v. Secretary of Health and Human Services,* 686 F.2d 76, 79 (1st Cir.1982) (quoting 42 U.S.C. § 423(d)(2)(A)).

The general issue in this case is whether the ALJ's decision to deny Conner's claim of disability was supported by substantial evidence. More specifically, the critical issue is whether Conner was disabled on or before September 30, 2001. That was his DLI, and Conner must demonstrate that his impairments became disabling before his DLI. *Deblois,* 686 F.2d at 79. If the ALJ had substantial evidence to support his decision that Conner was not disabled on or before September 30, 2001, then Conner's condition after that date is irrelevant.

The Social Security Act and regulations thereunder, 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v), apply a five step test to determine whether a claimant is disabled for the purposes of the Act. *Goodermote v. Secretary of Health and Human Services,* 690 F.2d 5, 6–7 (1st Cir. 1982).[5] Under the first step, if a claimant is currently employed, he or she is automatically considered not disabled. *Goodermote,* 690 F.2d at 6. If the claimant is not working, the decision maker moves to the next question. Under the second step, the ALJ asks whether the claimant has a severe impairment. *Id.* A severe impairment meets the durational requirement, *see* 20 C.F.R. § 404.1509, and "significantly limits your physical or mental ability to do basic work activities."[6] 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment he or she is found not disabled. *Goodermote,* 690 F.2d at 6. If the claimant is severely impaired, the third step applies. *Id.*

Under the third step, the ALJ asks whether the claimant has an impairment

---

**5.** The analysis is the same for Social Security Insurance and Social Security Disability Insurance. *See, e.g., Bazile v. Apfel,* 113 F.Supp.2d 181, 185 (D.Mass.2000).

**6.** Basic work activities include:
(1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2)capaci- ties for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.
20 C.F.R. § 404.1521(b).

equivalent to one listed in appendix 1, subpart P, part 404 of the Code of Federal Regulations. 20 C.F.R. § 416.920(a)(4)(iii); see 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant has a listed impairment or an impairment equivalent in severity to a listed impairment, the claimant is considered disabled. *Goodermote*, 690 F.2d at 6. If the claimant's impairment does not meet a listed impairment then the decision-maker considers the claimant's RFC to perform work under the fourth step. 20 C.F.R. § 404.1520(e).

Under the fourth step, the ALJ considers whether the claimant has the RFC to do his or her past relevant work. *Id.* Past relevant work is work that the claimant has done in the last 15 years. 20 C.F.R. § 404.1560(b)(1). If the claimant can still do past relevant work, then he or she is not disabled. *Goodermote*, 690 F.2d at 7. If the claimant cannot do past relevant work, then the fifth step applies. *Id.*

Under the fifth step, the ALJ asks whether the claimant's RFC, age, education and work experience indicate that the claimant could work another job in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.*

■ Applying the foregoing sequential analysis, Conner had not engaged in any substantial gainful activity since January 7, 2000, the alleged onset of disability. (Tr. 25). Thus, the ALJ correctly proceeded to step two of the analysis. At the second step, the ALJ found that Conner's back pain was a severe impairment. *Id.* After finding a severe impairment, the ALJ correctly proceeded to the third step.

The ALJ's analysis at the third step serves as the first point of contention between Conner and the Commissioner. Conner argues that his impairment met or equaled one of the listed impairments; namely, the one for disorders of the spine.

(Docket Entry #12); see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. To meet that listing, an individual needs to demonstrate that he or she has one of the:

> [d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Conner does not argue that he meets either the (B) or (C) portions of the listing, but he does argue that he meets the (A) portion of the listing. (Docket Entry # 25). The (A) portion of the listing includes a conjunctive analysis, though, and Conner's medical history does not match all of the requirements of (A). The ALJ noted that the "record shows ... there were no deficits with respect to motor strength, sensation or reflexes." (Tr.

22). Dr. Beretta did diagnose Conner with some sensory deficits in his "lower extremities along the dorsal aspect of the foot" (Tr. 137), but Conner has not referenced any specific documentation in the record of motor loss—only documentation of an antalgic gait and Conner's difficulty walking on his heels and toes. Absent a showing of motor loss, the ALJ was correct to conclude that Conner's condition did not meet the severity of the listing for a disorder of the spine on or before September 30, 2001 (Tr. 22), because Conner did not establish the presence of all of the elements of the conjunctive listing.

The ALJ properly proceeded to the fourth step to analyze Conner's RFC. (Tr. 23). For the RFC determination, the ALJ began by recounting Conner's testimony about his back pain, the numbness in his right leg, his migraine headaches and his pain with respect to sitting and standing. Next, the ALJ referred to Conner's MRI in February of 2000 that "revealed a disc protrusion which did not significantly compromise the neural foramina." The ALJ then mentioned the IME in which Dr. VonErtfelda concluded that Conner could perform light work. Finally, the ALJ referenced Dr. Philips' examination notes and Dr. Sabra's opinion that Conner did not need surgery. Based on this evidence the ALJ concluded that "during the period on or before September 30, 2001[, Conner] retained the [RFC] to perform light work that did not require more than occasional bending or lifting." The ALJ ended his step four analysis by concluding that since Conner's past work required a greater functional capacity than Conner currently possessed, Conner was unable to perform his past work. *Id.*

 In making an RFC determination, an ALJ may "piece together the relevant medical facts from the findings and opinions of multiple physicians." *Evangelista,*

826 F.2d at 144. The ALJ in this case did piece together the opinions of multiple physicians when he made his RFC determination and he relied on substantial evidence for that determination. Conner does not contest the ALJ's RFC determination as it pertains to the step four analysis. (Docket Entry # 12).

Conner does argue, however, that the ALJ gave too much weight to the IME and failed to consider the majority of the findings from the February 2000 MRI. (Docket Entry # 12). Presumably, Conner is arguing that if the ALJ had given less weight to the IME's conclusions and more weight to the MRI results he would have made a more restrictive RFC determination. This RFC determination, the argument would continue, would have altered the ALJ's step five analysis. Conner's explicit and inferred arguments regarding the ALJ's step five analysis are unpersuasive, however, and the ALJ had substantial evidence on which to base his step five conclusions.

 At the fifth step, the burden was on the Commissioner to demonstrate that jobs exist in significant numbers in the national economy that Conner could perform. *Freeman v. Barnhart,* 274 F.3d 606, 608 (1st Cir.2001). The Medical Vocational Guidelines ("the Grid"), at 20 C.F.R. Part 404, Subpart P, Appendix 2, apply at the fifth step and provide the opportunity for a "streamlined" analysis of a claimant's ability to perform certain jobs in the national economy. *Ortiz v. Secretary of Health and Human Services,* 890 F.2d 520, 524 (1st Cir.1989). The ALJ can only apply the Grid when a claimant's nonexertional limitations "do not significantly impair [his or her] ability to perform at a given exertional level." *Rose v. Shalala,* 34 F.3d 13, 19 (1st Cir.1994).

Nonexertional limitations are ones that affect the ability to meet "the demands of

jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling." 20 C.F.R. § 416.969a(a). The critical nonexertional limitation in Conner's case was his inability to perform work that required more than occasional bending. (Tr. 22). Social Security Ruling 85–15 explains that if a person can stoop, and thus bend, occasionally, the "light occupational base is virtually intact." Conner retained the capacity to bend occasionally, so his occupational base remained virtually intact and use of the Grid was appropriate. *Rose,* 34 F.3d at 19. As the ALJ described it, Conner's limitations "do not significantly erode the existing job base." (Tr. 25). Therefore, the ALJ was justified when he concluded that Conner "retains the capacity to adjust to work that exists in significant numbers in the national economy." *Id.*

Conner's arguments, noted *supra,* regarding the ALJ's RFC determination, do not weaken support for the ALJ's step five conclusions. The ALJ's reference to conclusions in the IME (Tr. 23) was just one of the bases for his RFC determination. The ALJ did not give those conclusions too much weight because he also referenced Dr. Henderson's conclusions about Conner's ability to perform light work. (Tr. 23). In addition, the ALJ took Conner's MRI results into account when making his RFC determination. *Id.* The ALJ thus did not err when making his RFC determination and there was substantial evidence supporting that determination and its application at steps four and five of the ALJ's analysis.

Conner also argues that the ALJ failed to recognize the progressive and debilitating nature of his disability as evidenced by further MRI testing. (Docket Entry # 12). The ALJ did acknowledge that Conner's condition worsened over time

(Tr. 23), but the key issue in this case was whether Conner was disabled on or before September 30, 2001. That was his DLI and since the ALJ had substantial evidence to support his decision that Conner was not disabled on or before September 30, 2001, Conner's condition after that date is irrelevant. *Deblois,* 686 F.2d at 79.

### CONCLUSION

In accordance with the foregoing discussion, Conner's motion to reverse or remand the decision of the Commissioner (Docket Entry # 11) is **DENIED,** the Commissioner's motion for an order affirming the decision of the Commissioner (Docket Entry # 15) is **ALLOWED** and the motion for reconsideration (Docket Entry # 25) is **DENIED.**